## LOCAL 24, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSE-MEN AND HELPERS OF AMERICA, AFL–CIO, ET AL. *v.* OLIVER ET AL.

No. 49.   Argued December 10–11, 1958.—Decided January 19, 1959.

*David Previant* argued the cause for petitioners. With him on the brief were *Robert C. Knee* and *Bruce Laybourne.*

*Stanley Denlinger* argued the cause and filed a brief for Oliver, respondent.

*Charles R. Iden* argued the cause for the A. C. E. Transportation Co., Inc., et al., respondents. With him on the brief was *E. W. Brouse.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

As the result of multiemployer, multistate collective bargaining with the Central States Drivers Council, comprising local unions of truck drivers affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, a collective bargaining agreement, the "Central States Area Over-the-Road Motor Freight Agreement," effective February 1, 1955, and expiring January 31, 1961, was entered into by the locals and motor carriers in interstate commerce who operate under the authority of the Interstate Commerce Commission [1] in 12 midwestern States, including Ohio.[2] Article XXXII of this collective bargaining agreement [3] prescribes terms and conditions which regulate the minimum rental and certain other terms of lease when a

---

[1] Certificates of convenience and necessity are issued to common carriers pursuant to §§ 206–208 of the Interstate Commerce Act, 49 Stat. 551, 552, as amended, 49 U. S. C. §§ 306–308; permits are issued to contract carriers pursuant to § 209, 49 Stat. 552, as amended, 49 U. S. C. § 309.

[2] The agreement covers between 3,000 and 3,500 employers and between 45,000 and 50,000 truck drivers. Those covered in Ohio consist of approximately 500 employers and 6,000 drivers. Upwards of 90% of the Ohio drivers drive equipment owned by carriers who operate under I. C. C. certificates or permits. The rest of the covered drivers own their own equipment, usually one vehicle, but since they are not holders of I. C. C. certificates or permits, they lease their equipment to, and drive it for, certificated or permitted carriers.

[3] For the text of Article XXXII, see Appendix, *post*, p. 298.

motor vehicle is leased to a carrier by an owner who drives his vehicle in the carrier's service.[4]   The Ohio courts enjoined the petitioner, Ohio's Teamsters Local 24 and its president, and the respondent carriers, A. C. E. Transportation Company, Inc., and Interstate Truck Service, Inc., Ohio employers, from giving effect to the provisions of Article XXXII.   The Ohio courts held that the Article violates the Ohio antitrust law, known as the Valentine Act.[5]   The question is whether the fact that the Article

---

[4] For details of I. C. C. regulations governing the relationship between certificated carriers and the lessors of motor vehicle equipment, see the discussion in *American Trucking Assns., Inc.,* v. *United States,* 344 U. S. 298.

[5] The specific provision involved, Ohio Rev. Code Ann. § 1331.01, provides as follows:

"As used in sections 1331.01 to 1331.14, inclusive, of the Revised Code:

"(A) 'Person' includes corporations, partnerships, and associations existing under or authorized by any state or territory of the United States, or a foreign country.

"(B) 'Trust' is a combination of capital, skill, or acts by two or more persons for any of the following purposes:

"(1) To create or carry out restrictions in trade or commerce;

"(2) To limit or reduce the production, or increase or reduce the price of merchandise or a commodity;

"(3) To prevent competition in manufacturing, making, transportation, sale, or purchase of merchandise, produce, or a commodity;

"(4) To fix at a standard or figure, whereby its price to the public or consumer is in any manner controlled or established, an article or commodity of merchandise, produce, or commerce intended for sale, barter, use, or consumption in this state;

"(5) To make, enter into, execute, or carry out contracts, obligations, or agreements of any kind by which they bind or have bound themselves not to sell, dispose of, or transport an article or commodity, or an article of trade, use, merchandise, commerce, or consumption below a common standard figure or fixed value, or by which they agree in any manner to keep the price of such article, commodity, or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of an article, com-

was contained in an agreement which was the fruit of the exercise of collective bargaining rights under the National Labor Relations Act[6] precluded the Ohio courts from applying the Ohio antitrust law to prohibit the parties from carrying out the terms of the Article they had agreed upon in bargaining. No claim is made that Article XXXII violates any provision of federal law.

The Article is in express terms made applicable only to a lessor-driver when he himself drives his vehicle in the

---

modity, or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, purchasers, or consumers in the sale or transportation of such article or commodity, or by which they agree to pool, combine, or directly or indirectly unite any interests which they have connected with the sale or transportation of such article or commodity, that its price might in any manner be affected.

"A trust as defined in division (B) of this section is unlawful and void."

[6] Involved are §§ 7 and 8 of the National Labor Relations Act, as amended and re-enacted by the Labor Management Relations Act, 61 Stat. 140, 29 U. S. C. §§ 157, 158. Section 7 is as follows:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a) (3)."

Sections 8 (a) (5) and 8 (b) (3) require employers and labor organizations to bargain collectively. Section 8 (d), in pertinent part, provides:

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party . . . ."

business of the lessee-carrier. § 1. The Article, at least in words, constitutes the lessor-driver an employee of the carrier at such times: "The employer [the carrier] expressly reserves the right to control the manner, means and details of, and by which, the owner-operator performs his services, as well as the ends to be accomplished." § 4. His wages, hours and working conditions are then to be those applied to the carrier's drivers of carrier-owned vehicles, and he has "seniority as a driver only." § 2. He must operate his vehicle at such times "exclusively in . . . [the carrier's] service and for no other interests." § 1. The carrier "agrees to pay . . . social security tax, compensation insurance, public liability and property damage insurance, bridge tolls" and various other fees imposed on motor freight transportation, except "that the owner-driver shall pay license fees in the state in which title is registered." § 10. The lessor-driver must be compensated by "separate checks . . . for driver's wages and equipment rental." § 6. The wage payment must be in the amount of "the full wage rate and supplementary allowances" payable to carrier drivers similarly circumstanced who drive carrier-owned vehicles. § 12 (a). The equipment rental payment must be in an amount not less than "the minimum rates" specified by the Article which "result from the joint determination of the parties that such rates represent only the actual cost of operating such [leased] equipment. The parties have not attempted to negotiate a profit for the owner-driver." § 12 (b). All leases by union members who drive their vehicles for carriers in effect on the operative date of the collective bargaining agreement are to "be dissolved or modified within thirty (30) days" to conform to the terms and conditions of the Article. § 15. The parties declare that "the intent of this clause [the Article] . . . is to assure the payment of the Union scale of wages . . . and to prohibit [a carrier from] the making

and carrying out of any plan, scheme or device to circumvent or defeat the payment of wage scales provided in this Agreement. . . . [and] to prevent the continuation of or formation of combinations or corporations or so-called lease of fleet arrangements whereby the driver [of his own vehicle] is required to and does periodically pay losses sustained by the corporation or fleet arrangement, or is required to accept less than the actual cost of the running of his equipment, thus, in fact, reducing his scale of pay." § 16.

The respondent, Revel Oliver, a member of the union, is the owner of motor equipment [7] which, at the time the collective bargaining agreement was negotiated, was subject to written lease agreements with the carrier respondents, A. C. E. Transportation Company, Inc., and Interstate Truck Service, Inc. The terms and conditions of the leases, particularly in regard to rental compensation, differ substantially from those provided in Article XXXII.[8]

Oliver brought this action on January 20, 1955, in the Court of Common Pleas, Summit County, Ohio, for an injunction restraining the petitioners and the respondent carriers from carrying out the terms of Article XXXII.

---

[7] Oliver is rather unusual among Ohio owner-drivers because he owns not one vehicle but a fleet, six trucks and four trailers, each of which is under a lease agreement with one or the other of the carrier respondents. Oliver drove only occasionally, "every month or so for A. C. E. and every eight months or so for Interstate," and Article XXXII applied to his leases only as to the vehicle he drove on those occasions.

[8] Accordingly, § 15 of Art. XXXII required the carriers to take steps to modify both agreements. The Interstate Truck Service lease with Oliver was for a fixed term, but contained a five-day cancellation clause. The agreement between A. C. E. and Oliver was not for any fixed term and was brought into effect by the issuance of individual waybills and manifests for particular hauls.

He obtained a temporary restraining order upon sworn allegations. At the trial the respondent carriers joined with Oliver in making the attack on the Article. The petitioners defended on the ground that the State could not lawfully exercise power to apply its antitrust law to cause a forfeiture of the product of the exercise of federally sanctioned collective bargaining rights. The union justified the Article as necessary to prevent undermining of the negotiated drivers' wage scale said to result from a practice of carriers of leasing a vehicle from an owner-driver at a rental which returned to the owner-driver less than his actual costs of operation, so that the driver's wage received by him, although nominally the negotiated wage, was actually a wage reduced by the excess of his operating expenses over the rental he received. The Court of Common Pleas held in an unreported opinion that the National Labor Relations Act could not "be reasonably construed to permit this remote and indirect approach to the subject of wages," and that Article XXXII was in violation of the State's antitrust law because "there are restrictions and restraints imposed upon articles [the leased vehicles] that are widely used in trade and commerce. . . . [and] preclude an owner of property from reasonable freedom of action in dealing with it." On the petitioners' appeal to Ohio's Ninth Judicial District Court of Appeals that court heard the case *de novo* and affirmed the judgment of the Court of Common Pleas, adopting its opinion. The Court of Appeals entered a permanent injunction perpetually restraining the petitioners and the respondent carriers (1) "from entering into any agreements . . . or carrying out the . . . requirements . . . of any such agreement, which will require the alteration" of Revel Oliver's "existing lease or leasing agreement"; (2) "from entering into any . . . agreement or stipulation in the future, or

the negotiation therefor, the . . . tendency of which is to . . . determine in any manner the rate to be charged for the use of" Revel Oliver's equipment; (3) "from giving force and effect to Section 32 [sic] of the Contract . . . or any modification . . . thereof, the . . . tendency of which shall attempt to fix the rates" for the use of Revel Oliver's equipment.[9]   Petitioners' appeal

[9] The restraints entered by the judgment and order of the Court of Appeals filed September 30, 1957, are:

"(a) That the defendants-appellees, A. C. E. Transportation Co., Inc., Interstate Truck Service, Inc., and defendants-appellants, Local No. 24 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers and each of them, their agents, representatives and successors or persons, acting, by, through or for them, or in concert with each other, are hereby perpetually restrained and enjoined from entering into any agreements one with the other or carrying out the effects, requirements or terms of any such agreement, which will require the alteration, cancellation or violation of plaintiff-appellee's [Revel Oliver's] existing lease or leasing agreement or any such agreement hereafter renewed or renegotiated and entered into, and

"(b) That the defendants-appellees, A. C. E. Transportation Co., Inc., Interstate Truck Service, Inc., and defendants-appellants, Local No. 24 of The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers and Kenneth Burke, President and Business Agent of said Local and each of them and the successor of each and those acting in concert with said defendants-appellees and appellants are hereby perpetually enjoined and restrained from entering into any combination, arrangement, agreement or stipulation in the future, or the negotiation therefor, the purpose, intent or tendency of which is to fix or determine in any manner the rate to be charged for the use of plaintiff's equipment, leased by said plaintiff-appellee to the defendants-appellees, A. C. E. Transportation Co., Inc., and Interstate Truck Service, Inc., and

"(c) That the said defendants-appellees, A. C. E. Transportation Co., Inc., Interstate Truck Service, Inc., and defendants-appellants, Local No. 24 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers and Kenneth Burke, President and Business Agent of said Local and each of them and the successors

to the Ohio Supreme Court was dismissed for want of a debatable constitutional question. 167 Ohio St. 299, 147 N. E. 2d 856. We granted certiorari to consider the important question raised of the interaction of state and federal power arising from the petitioners' claim that the Ohio regulation abridges rights protected by federal statute. 356 U. S. 966.

Article XXXII did not originate with the 1955 agreement. The carriers and the union have disputed since 1938 the terms of a carrier's hire of a lessor's driving services with his leased vehicle. The usual lease is by the owner of a single vehicle who hires out his services as driver with his vehicle. A carrier's representative who has participated in all contract negotiations since those leading to the 1938 agreement testified to the history. According to him, the nub of the union's position over the two decades has been that the carriers abuse the leasing practice, particularly by paying inadequate rentals for the use of leased vehicles, with the result "that part of the men's wages for driving was being used for the upkeep of their vehicles . . . . They [the union] claimed that the leased people were breaking down the rate structure . . . ." The union's demands for contract provisions to safeguard against the alleged abuse were designed also to "secure a living wage [for the lessor] plus an adequate rental for his equipment." A minimum rental clause first appeared in the 1938 agreement which also contained provisions comparable to §§ 8, 10 and 14 of present Article XXXII.

---

of each are hereby perpetually enjoined from giving force and effect to Section 32 [*sic*] of the Contract between them as is fully set forth in this Court's finding, or any modification or alteration thereof, the import, effect or tendency of which shall attempt to fix the rates and the use of plaintiff-appellee's equipment or to fix or determine the return for plaintiff-appellee's capital investment in said equipment."

In 1939, after the union claimed that "there was a lot of people that was transferring their title into other people's name to avoid the conditions of the contract," § 3 was added to provide that "certificate and title to the equipment must be in the name of the actual owner." When the dispute brought the parties to the verge of a strike in 1941, the note to § 1 and §§ 13, 15, 16, 17 and 18 came into the agreement. But by 1946 the controversy reached a pitch where the union demanded agreement from the carriers to abolish the leasing practice: "The unions were going to refuse the addition of any individual owners, and the unions also desired to make certain restrictions on the use of owner-operators, again claiming that the . . . company operators were taking advantage of certain provisions of the contract." This demand was compromised by the addition of § 19 restricting leasing to carriers "who will agree to submit all grievances pertaining to owner-operators to joint Employer-Union grievance committees in each respective state"; the section "represented the compromise between the union position that it should abolish all owner-operators and the companies' contention there should be no limitation."

*First.* The Ohio courts rejected the petitioners' contention that the evidence conclusively established that Article XXXII dealt with subject matter within the scope of "collective bargaining" in which federal law gave petitioners the right to engage. The state courts rested their judgments principally on the minimum rental regulations of § 12 of the Article. The principal discussion occurs in the opinion of the Court of Common Pleas. These regulations were held to constitute the Article a price-fixing arrangement violating the Ohio antitrust law in that they evidenced "concerted action of the Union combining with a non-labor third party in a formal contract. . . . [the] effect [of which] is to oppress and

destroy competition. . . . [and] preclude an owner of property from reasonable freedom of action in dealing with it."

It seems to us that in considering whether the Article deals with a subject matter within the scope of collective bargaining as defined by federal law the Ohio courts did not give proper significance to the Article's narrowly restricted application to the times when the owner drives his leased vehicle for the carrier, and to the adverse effects upon the negotiated wage scale which might result when the rental for the use of the leased vehicle was unregulated at these times. Since no claim was presented to the Ohio courts that the petitioners sought to apply these regulations to Revel Oliver's arrangements with the respondent carriers except on the very infrequent and irregular occasions when Oliver drove one of his vehicles for a carrier, we take it that the Ohio courts' opinions and judgments relate only to the validity of the Article as applied at such times. This would necessarily be the case as the text of the Article, and that text as illumined by its history, conclusively establish that the regulations in no wise apply to the terms of lease of a vehicle when driven by a driver not the owner of the vehicle; the wages, hours and working conditions to be observed by contracting employers of non-owner drivers are governed by the general provisions in that regard found in other articles of the collective bargaining agreement.

In the light of the Article's history and purpose, we cannot agree with the Court of Common Pleas that its regulations constitute a "remote and indirect approach to the subject of wages," outside the range of matters on which the federal law requires the parties to bargain. The text of the Article and its unchallenged history show that its objective is to protect the negotiated wage scale against the possible undermining through diminution of

the owner's wages for driving which might result from a rental which did not cover his operating costs. This is thus but an instance, as this Court said of a somewhat similar union demand in another case, in which a union seeks to protect lawful employee interests against what is believed, rightly or wrongly, to be "a scheme or device utilized for the purpose of escaping the payment of union wages and the assumption of working conditions commensurate with those imposed under union standards." *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, Inc.*, 311 U. S. 91, 98–99. Looked at in this light, as on the evidence it must be, to determine its relevance to the collective bargaining rights under the Federal Act, the point of the Article is obviously not price fixing but wages. The regulations embody not the "remote and indirect approach to the subject of wages" perceived by the Court of Common Pleas but a direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective bargaining contract. The inadequacy of a rental which means that the owner makes up his excess costs from his driver's wages not only clearly bears a close relation to labor's efforts to improve working conditions but is in fact of vital concern to the carrier's employed drivers; an inadequate rental might mean the progressive curtailment of jobs through withdrawal of more and more carrier-owned vehicles from service. Cf. *Bakery Drivers Local* v. *Wohl*, 315 U. S. 769, 771. It is not necessary to attempt to set precise outside limits to the subject matter properly included within the scope of mandatory collective bargaining, cf. *Labor Board* v. *Borg-Warner Corp.*, 356 U. S. 342, to hold, as we do, that the obligation under § 8 (d) on the carriers and their employees to bargain collectively "with respect to wages, hours, and other terms and conditions of employment" and to embody their understanding in "a

written contract incorporating any agreement reached," found an expression in the subject matter of Article XXXII. See *Timken Roller Bearing Co.,* 70 N. L. R. B. 500, 518, reversed on other grounds, 161 F. 2d 949. And certainly bargaining on this subject through their representatives was a right of the employees protected by § 7 of the Act.

*Second.* We must decide whether Ohio's antitrust law may be applied to prevent the contracting parties from carrying out their agreement upon a subject matter as to which federal law directs them to bargain. Little extended discussion is necessary to show that Ohio law cannot be so applied. We need not concern ourselves today with a contractual provision dealing with a subject matter that the parties were under no obligation to discuss; the carriers as employers were under a duty to bargain collectively with the union as to the subject matter of the Article, as we have shown. The goal of federal labor policy, as expressed in the Wagner and Taft-Hartley Acts, is the promotion of collective bargaining; to encourage the employer and the representative of the employees to establish, through collective negotiation, their own charter for the ordering of industrial relations, and thereby to minimize industrial strife. See *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 45; *Labor Board* v. *American National Ins. Co.,* 343 U. S. 395, 401–402. Within the area in which collective bargaining was required, Congress was not concerned with the substantive terms upon which the parties agreed. Cf. *Terminal Railroad Assn.* v. *Brotherhood of Railroad Trainmen,* 318 U. S. 1, 6. The purposes of the Acts are served by bringing the parties together and establishing conditions under which they are to work out their agreement themselves. To allow the application of the Ohio antitrust law here would wholly defeat the full realization of the congres-

sional purpose. The application would frustrate the parties' solution of a problem which Congress has required them to negotiate in good faith toward solving, and in the solution of which it imposed no limitations relevant here. Federal law here created the duty upon the parties to bargain collectively; Congress has provided for a system of federal law applicable to the agreement the parties made in response to that duty, *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448; and federal law sets some outside limits (not contended to be exceeded here) on what their agreement may provide, see *Allen Bradley Co.* v. *Local Union,* 325 U. S. 797; cf. *United States* v. *Employing Plasterers Assn.,* 347 U. S. 186, 190. We believe that there is no room in this scheme for the application here of this state policy limiting the solutions that the parties' agreement can provide to the problems of wages and working conditions. Cf. *California* v. *Taylor,* 353 U. S. 553, 566–567. Since the federal law operates here, in an area where its authority is paramount, to leave the parties free, the inconsistent application of state law is necessarily outside the power of the State. *Hill* v. *Florida,* 325 U. S. 538, 542–544. Cf. *International Union* v. *O'Brien,* 339 U. S. 454, 457; *Amalgamated Assn.* v. *Wisconsin Employment Relations Board,* 340 U. S. 383; *Plankinton Packing Co.* v. *Wisconsin Employment Relations Board,* 338 U. S. 953. The solution worked out by the parties was not one of a sort which Congress has indicated may be left to prohibition by the several States. Cf. *Algoma Plywood & Veneer Co.* v. *Wisconsin Employment Relations Board,* 336 U. S. 301, 307–312.[10] Of course, the paramount force of the federal

---

[10] In *Algoma,* state law was allowed to operate to restrict a provision of a collective bargaining contract only after it was found after an exhaustive examination of the legislative history of the Wagner Act that Congress intended to leave the special subject of

law remains even though it is expressed in the details of a contract federal law empowers the parties to make, rather than in terms in an enactment of Congress. See *Railway Employes' Dept.* v. *Hanson,* 351 U. S. 225, 232. Clearly it is immaterial that the conflict is between federal labor law and the application of what the State characterizes as an antitrust law. ". . . Congress has sufficiently expressed its purpose to . . . exclude state prohibition, even though that with which the federal law is concerned as a matter of labor relations be related by the State to the more inclusive area of restraint of trade." *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468, 481. We have not here a case of a collective bargaining agreement in conflict with a local health or safety regulation; the conflict here is between the federally sanctioned agreement and state policy which seeks specifically to adjust relationships in the world of commerce. If there is to be this sort of limitation on the arrangements that unions and employers may make with regard to these subjects, pursuant to the collective bargaining provisions of the Wagner and Taft-Hartley Acts, it is for Congress, not the States, to provide it.

*Reversed.*

The Chief Justice, Mr. Justice Frankfurter and Mr. Justice Stewart took no part in the consideration or decision of this case.

Mr. Justice Whittaker, believing that respondent Oliver, while driving his own tractor in the performance of his independent contract with the respondent carriers,

the legality of maintenance of membership clauses up to the States through § 8 (3) of that Act, 49 Stat. 452. Questions of the nature that we consider today were expressly left open. 336 U. S., at 312.

was not an employee of those carriers, but was an independent contractor, *United States* v. *Silk*, 331 U. S. 704, and that, as such, he was expressly excluded from the coverage of the National Labor Relations Act by 61 Stat. 137, 29 U. S. C. § 152 (3), would affirm the judgment of the Court of Appeals for the Ninth Judicial District of Ohio.

## APPENDIX TO OPINION OF THE COURT.

*Article XXXII of the Central States Area Over-the-Road Motor Freight Agreement.*

### Owner-Operators.

Section 1. Owner-operators (See Note), other than certificated or permitted carriers, shall not be covered by this Agreement unless affiliated by lease with a certificated or permitted carrier which is required to operate in full compliance with all the provisions of this Agreement and holding proper ICC and state certificates and permits. Such owner-operators shall operate exclusively in such service and for no other interests.

(NOTE: Whenever "owner-operator" is used in this article, it means owner-driver only, and nothing in this article shall apply to any equipment leased except where owner is also employed as a driver.)

Section 2. This type of operator's compensation for wages and working conditions shall be in full accordance with all the provisions of this Agreement. The owner-operator shall have seniority as a driver only.

Section 3. Certificate and title to the equipment must be in the name of the actual owner.

Section 4. In all cases, hired or leased equipment shall be operated by an employee of the certificated or permitted carrier. The employer expressly reserves the right

to control the manner, means and details of, and by which, the owner-operator performs his services, as well as the ends to be accomplished.

Section 5. Certificated or permitted carriers shall use their own available equipment, together with all leased equipment under minimum thirty-day bona fide lease arrangements, on a rotating board, before hiring any extra equipment.

Section 6. Separate checks shall be issued by the certificated or permitted carriers for driver's wages and equipment rental. At no time shall the equipment check be for less than actual miles operated. Separate checks for drivers shall not be deducted from the minimum truck rental revenue. The driver shall turn in time direct to the certificated or permitted carrier. All monies due the owner-operator may be held no longer than two weeks, except where the lease of equipment agreement is terminated and in such cases all monies due the operator may be held no longer than thirty (30) days from the date of the termination of the operation of the equipment.

Section 7. Payment for equipment service shall be handled by the issuance of a check for the full mileage operated, tonnage or percentage, less any agreed advances. A statement of any charges by the certificated or permitted carrier shall be issued at the same time, but shall not be deducted in advance.

Section 8. The owner-operator shall have complete freedom to purchase gasoline, oil, grease, tires, tubes, etc., including repair work, at any place where efficient service and satisfactory products can be obtained at the most favorable prices.

Section 9. There shall be no deduction pertaining to equipment operation for any reason whatsoever.

Section 10. The Employer or certificated or permitted carrier hereby agrees to pay road or mile tax, social security

tax, compensation insurance, public liability and property damage insurance, bridge tolls, fees for certificates, permits and travel orders, fines and penalties for inadequate certificates, license fees, weight tax and wheel tax, and for loss of driving time due to waiting at state lines, and also cargo insurance. It is expressly understood that the owner-driver shall pay the license fees in the state in which title is registered.

All tolls, no matter how computed, must be paid by the Employer regardless of any agreement to the contrary.

All taxes or additional charges imposed by law relating to actual truck operation and use of highways, no matter how computed or named, shall be paid by the Carrier, excepting only vehicle licensing as such, in the state where title is registered.

Section 11. There shall be no interest or handling charge on earned money advanced prior to the regular pay day.

Section 12. (a) All certificated or permitted carriers hiring or leasing equipment owned and driven by the owner-driver shall file a true copy of the lease agreement covering the owner-driven equipment with the Joint State Committees. The terms of the lease shall cover only the equipment owned and driven by the owner-driver and shall be in complete accord with the minimum rates and conditions provided herein, plus the full wage rate and supplementary allowances for drivers as embodied elsewhere in this Agreement.

(b) The minimum rate for leased equipment owned and driven by the owner-driver shall be:

|  | Per Mile |
|---|---|
| Single axle, tractor only | 9½¢ |
| Tandem axle, tractor only | 10¢ |
| Single axle, trailer only | 3¢ |
| Tandem axle, trailer only | 4¢ |

75% of the above rates to apply for deadheading, if and when ordered, provided, however, that the 75% rate will apply only on first empty dispatch away from the home terminal; thereafter the full equipment rental rate to apply until driver is redispatched from home terminal; the above rates to be based on 23,000-pound load limit. On load limits over 23,000 pounds, there shall be one-half (½) cent additional per mile for each 1,000 pounds or fraction thereof in excess of 23,000 pounds. There shall be a minimum guarantee of 24,000 pounds for leased equipment owned and driven by the owner-driver. Nothing herein shall apply to leased equipment not owned by a driver.

The minimum rates set forth above result from the joint determination of the parties that such rates represent only the actual cost of operating such equipment. The parties have not attempted to negotiate a profit for the owner-driver.

Section 13. Driver-owner mileage scale does not include use of equipment for pickup or delivery at point of origin terminal or at point of destination terminal, but shall be subject to negotiations between the Local Union and Company. Failure to agree shall be submitted to the grievance procedure.

Section 14. There shall be no reductions where the present basis of payment is higher than the minimums established herein for this type of operation. Where owner-operator is paid on a percentage or tonnage basis and the operating company reduces its tariff, the percentage or tonnage basis of payment shall be automatically adjusted so that the owner-operator suffers no reduction in equipment rental or wages, or both.

Section 15. It is further understood and agreed that any arrangements which have heretofore been entered into between members of this Union, either among themselves or with the Employer or with the aid of the Em-

ployer, applicable to owner-driver equipment contrary to the terms hereof, shall be dissolved or modified within thirty (30) days after the signing of this Agreement so that such arrangements shall apply only to equipment of the owner-driver while being driven by such owner-driver. In the event that the parties cannot agree on a method of dissolution or modification of such arrangement to make the same conform to this Agreement, the question of dissolution or modification shall be submitted to arbitration, each party to select one member of the arbitration board, and the two so selected to choose a third member of said board. If the two cannot agree upon the third within five (5) days, he shall be appointed by the Joint State Committee. The decision of said board to be final and binding.

Section 16. It is further agreed that the intent of this clause and this entire Agreement is to assure the payment of the Union scale of wages as provided in this Agreement and to prohibit the making and carrying out of any plan, scheme or device to circumvent or defeat the payment of wage scales provided in this Agreement. This clause is intended to prevent the continuation of or formation of combinations or corporations or so-called lease of fleet arrangements whereby the driver is required to and does periodically pay losses sustained by the corporation or fleet arrangement, or is required to accept less than the actual cost of the running of his equipment, thus, in fact, reducing his scale of pay.

Section 17. It is further agreed that if the Employer or certificated or permitted carrier requires that the "driver-owner-operator" sell his equipment to the Employer or certificated or permitted carrier, directly or indirectly, the "driver-owner-operator" shall be paid the fair true value of such equipment. Copies of the instruments of sale shall be filed with the Union and unless objected to within ten (10) days shall be deemed satisfactory. If any

question is raised by the Union as to such value, the same shall be submitted to arbitration, as above set forth, for determination. The decision of the arbitration board shall be final and binding.

Section 18. It is further agreed that the Employer or certificated or permitted carrier will not devise or put into operation any scheme, whether herein enumerated or not, to defeat the terms of this Agreement, wherein the provisions as to compensation for services on and for use of equipment owned by owner-driver shall be lessened, nor shall any owner-driver lease be cancelled for the purpose of depriving Union employees of employment, and any such complaint that should arise pertaining to such cancellation of lease or violation under this section shall be subject to ARTICLE X.

Section 19. (a) The use of individual owner-operators shall be permitted by all certificated or permitted carriers who will agree to submit all grievances pertaining to owner-operators to joint Employer-Union grievance committees in each respective state. It is understood and agreed that all such grievances will be promptly heard and decided with the specific purpose in mind of

(1) protecting provisions of the Union contract;

(2) prohibiting any and all violations directly or indirectly of contract provisions relating to the proper use of individual owners;

(3) prohibiting any attempts by any certificated or permitted carrier in changing his operation which will affect the rights of drivers under the terms of the contract, and generally the certificated or permitted carriers agree to assume responsibility in policing and doing everything within their power to eliminate all alleged abuses in the use of owner-drivers which resulted in the insertion of Section 19 (Article XXXIII) in the original 1945–47 Over-the-Road contract;

(4) owner-driver operations to be terminal to terminal, except where no local employees to make such deliveries or otherwise agreed to in this contract;

(5) the certificated or permitted carriers agree that they will, with a joint meeting of the Unions, set up uniform rules and practices under which all such cases will be heard;

(6) it shall be considered a violation of the contract should any operator deduct from rental of equipment the increases provided for by the 1955 Amendments or put into effect any means of evasion to circumvent actual payment of increases agreed upon effective for the period starting February 1, 1955, and ending January 31, 1961.

(b) No owner-operator shall be permitted to drive or hold seniority where he owns three or more pieces of leased equipment. This provision shall not apply to present owner-operators having three or more pieces of equipment under lease agreement, but such owner-operator shall not be permitted to put additional equipment in service so long as he engages in work covered by this Agreement or holds seniority. Where owner-operator drives, he can hold seniority where he works sixty (60) per cent or more of time.