KEYSTONE STEEL & WIRE, DIVISION OF KEYSTONE CONSOLIDATED INDUSTRIES, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 93–1357.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 8, 1994.

Decided Dec. 16, 1994.

Mark G. Arnold, St. Louis, MO, argued the cause and filed the briefs for petitioner.

William M. Bernstein, Atty., N.L.R.B., Washington, DC, argued the cause for respondent. With him on the brief were Linda R. Sher, Acting Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, DC.

Before WALD, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Keystone Steel & Wire ("Keystone") appeals from the National Labor Relations Board's ("Board") decision that it committed an unfair labor practice in unilaterally terminating its practice of allowing employees who had participated in both its Union and Management Pension Plans to receive benefits from both plans under the less restrictive Union Plan eligibility criteria. We find that (1) the "vitally affects" doctrine does not support the Board's decision, and (2) there was insufficient notice of and record evidence to support the Board's reliance on the implied term theory. Accordingly, we reverse the Board's decision and remand the case for further evidentiary development of its implied term theory in accordance with this opinion.

## I. BACKGROUND

Keystone operates a factory in Bartonville, Illinois. Its production and maintenance employees are unionized in a bargaining unit numbering approximately 1270 ("unit employees") and are represented by the Independent Steel Workers' Alliance ("the Union"). At issue here are the pension benefit rights of employees who have experience both in management and in the bargaining unit.

Keystone has two pension plans, the Keystone–Bartonville Pension Plan for unit employees ("the Union Plan") and the Keystone Steel & Wire Company Plan for management employees ("the Management Plan"). Both plans require that employees work for Keystone for a certain period of time before they are eligible to retire and receive full pension benefits. Employees who switch between bargaining unit and management employment switch plan coverage, but are allowed to count all periods of employment with Keystone toward the plans' eligibility requirements.

Prior to 1982, the Union and the Management Plans both allowed full pension benefits to those who had been employed by Keystone for thirty years. In 1982, Keystone eliminated this thirty-and-out option in the Management Plan but retained it in the Un-

ion Plan for those persons hired or rehired by Keystone before May 3, 1982.[1] Between 1982 and 1988, however, certain retirees avoided the new restrictions of Management Plan eligibility. Thirty-five dual participants—employees who had worked in both unit and non-unit positions—were allowed to retire under the Union Plan's thirty-and-out option and to receive the retirement benefits they had accrued under both the Union and the Management Plans. Nineteen of these dual participants would not have been eligible for Management Plan benefits under Management Plan criteria at the time they retired, but nevertheless received full pension benefits. The parties have termed these nineteen persons the "Affected Retirees." The record does not establish the pre-retirement employment status of the Affected Retirees, but at least some of them were management employees who were allowed to transfer back into the unit immediately prior to retirement. The record shows that this transfer enabled them to receive the benefit of the Union's "superior" medical plan, Hearing Transcript at 65–66, 68 (May 20, 1991) (No. 33–CA–8519) ("Hearing Transcript"), but does not establish the relation, if any, between the transfer and full payment of Management Plan benefits to those retirees who also met the Union Plan's thirty-and-out eligibility criteria.

Until 1986, Keystone charged the full pension costs for dual participants to the plan under which they retired. Thus, if a dual participant had accrued benefits under both the Management and the Union Plans, but ultimately retired under the Union Plan, the Union Plan was charged for the full costs of the benefits. In 1986, the Union objected to this allocation of costs, and Keystone adopted a pro rata cost allocation, under which each plan paid its proportionate share of the benefits. From that point, the Management Plan paid its share of the pension benefits to the 35 dual participants, including the nineteen Affected Retirees who did not actually meet

the retirement eligibility requirements of the Management Plan.

In 1988, Keystone's attorneys advised the company that it could not legally pay pension benefits under the Management Plan to retirees who did not meet that Plan's eligibility requirements. Keystone consequently decided to end its practice of allowing dual participants to receive pensions from the Management Plan when they were not eligible for such payments under that Plan. This decision affected three different groups of employees—termed Group I, Group II, and Group III by the parties. Group I consists of the Affected Retirees already receiving the benefit of Keystone's practice of providing Management Plan benefits to dual participants who also qualified for the Union Plan's thirty-and-out option. Keystone informed the Affected Retirees that it would no longer make payments to them directly from the Management Plan, but that it would make up that shortfall from company funds. Group II consists of 147 dual participants currently serving in non-unit positions;[2] Group III consists of 36 dual participants currently serving in unit positions. Keystone informed Group II and III members that only the Union Plan portion of their benefits would be available when they qualified for the Union Plan's thirty-and-out option; they would not receive Management Plan benefits until they met the Management Plan eligibility criteria.

The Union objected to the change in practice with respect to the Group III employees—dual participants currently in unit positions—and complained to the Board. The Union argued that Keystone committed an unfair labor practice in unilaterally terminating the practice of allowing dual participants who also qualified for the Union Plan's thirty-and-out option to receive Management Plan benefits. The Board's General Counsel brought charges against Keystone.

The General Counsel's case against Keystone was based principally on the "vitally affects" doctrine. *See Allied Chemical &*

---

1. As this case involves the rights of those union employees who retained the thirty-and-out option, for our purposes, the Union Plan has the thirty-and-out option and the Management Plan does not.

2. Three members of Group II had retirement applications pending at the time Keystone terminated the practice, and Keystone decided to grandfather these applications, treating these employees as it did the Affected Retirees.

*Alkali Workers of America v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 179, 92 S.Ct. 383, 397–98, 30 L.Ed.2d 341 (1971). In changing the administration of the Management Plan, the General Counsel argued, the company *affected* the compensation of unit employees with management experience. This effect made the precipitating change a mandatory subject of bargaining. The General Counsel's complaint pressed only this theory. It charged that Keystone committed an unfair labor practice when it "implemented changes in benefit payments and entitlements paid pursuant to . . . the Management Pension Plan," "applied the changes . . . to those employees in the Unit who had earned entitlements to benefits under the Management Plan for past service in non-unit capacities," and thereby "reduced the pension benefits of certain employees in the Unit who had prior service in non-unit capacities." Amended Complaint and Notice of Hearing at 4 (Jan. 17, 1991). The General Counsel also made brief references in her opening statement and on two pages of her Brief in Support of Exceptions to the Administrative Law Judge's ("ALJ") decision to an implied term theory—that Keystone's practice of providing Management Plan payments under the Union Plan's thirty-and-out option became an implied term of unit employment. She did not, however, present any evidence or detailed analysis to support this theory.

The ALJ found that Keystone had no obligation to bargain with the Union over the Management Plan because "[t]he benefits to be derived under [the Management] plan are, like wages, salaries and other benefits . . . remuneration for work performed outside the unit by nonunit employees." The fact that certain unit employees had transferred from non-unit work and thus had past experience under the Management Plan, the ALJ concluded, was "irrelevant" because "[s]uch a transfer does not endow the Union with bargaining rights over the Management Plan where none existed before." *Keystone Steel & Wire,* No. 33–CA–8519, Decision of the A.L.J. at 9–10 (Feb. 18, 1992), *reprinted in* Deferred Appendix at 47–48.

The Board reversed. It found that Keystone's "practice of paying pension benefits under both the Union Plan and the Management Plan to dual participants who retired from unit positions and met the Union Plan's thirty-and-out eligibility requirement became well established," and that this practice was "directly linked to employment in the bargaining unit" because it was only available to those who retired from unit positions. *Keystone Steel & Wire Division of Keystone Consolidated Industries, Inc.,* 309 N.L.R.B. 294, 296 (1992). It concluded that the practice became an implied term and condition of bargaining unit employment, and, therefore, a mandatory subject of bargaining. Though it relied principally on the implied term theory, in a footnote the Board seemed also to approve the application of the "vitally affects" theory to the case, noting that "[t]he changes to the Management Plan affected the rights of individuals who were employees in the bargaining unit." *See id.* at 297 n. 6.

Keystone appeals, arguing that it had inadequate notice of the implied term theory, that there is inadequate evidence for that theory, and that the "vitally affects" theory is inapposite.

## II. Implied Term Theory

■ Under the implied term theory, "[a]n employer's '[p]ast practice' can become 'clearly established as a term and condition of employment' subject to the duty to bargain." *International Brotherhood of Electrical Workers, Local 1466 v. NLRB,* 795 F.2d 150, 153 (D.C.Cir.1986) (quoting *Office & Professional Employees International Union, Local 425 v. NLRB,* 419 F.2d 314, 321 (D.C.Cir.1969)). *See, e.g., Riverside Cement Co.,* 296 N.L.R.B. 840, 841 (1989) ("It is well settled that a practice not included in a written contract can become an implied term and condition of employment by mutual consent of the parties."); *Sacramento Union,* 258 N.L.R.B. 1074, 1075 (1981) (regularly observed priority list system for job assignments is an implied term and therefore a mandatory subject of bargaining, even though the "practice[ ] may have constituted a deviation from the letter of the parties' . . . agreement").

In this case, the Board found an implied term in Keystone's "practice of permitting

unit employees who were dual participants and eligible for retirement under the Union Plan's thirty-and-out option to retire and receive pension benefit payments under that plan and also under the Management Plan, even if they were not eligible for pension payments under any of the retirement options described in the Management Plan's formal documents." *Keystone*, 309 N.L.R.B. at 296. It found that this practice "became well established," "[i]t continued for 6 years," and, "[b]y this practice, [Keystone] provided an enhanced pension benefit available only to unit employees." *Id.* "This practice—directly linked to employment in the bargaining unit," it concluded, "became an implied term and condition of employment of bargaining unit employees by mutual consent of the parties." *Id.* at 296–97.

If there were evidentiary support for the Board's conclusion that, for six years, Keystone had a well established practice of "provid[ing] an enhanced pension benefit available only to unit employees," then we would not disrupt the Board's conclusion that that practice has become an implied term and condition of unit employment. Keystone argues, however, that the Board's conclusion that the practice was tied to unit employment is not supported by substantial evidence, and that the company had no opportunity to present evidence to the contrary because the case was not litigated on the implied term theory below. Based on our review of the record and of the arguments made before the Board, we agree.

■ Keystone first argues that it was not put on notice of the need to present evidence to rebut the implied term theory on which the Board ultimately relied. The Board's decision rested on the existence of a unit-specific practice—making Management Plan payments to those who also qualified for the Union Plan's thirty-and-out option—that became an implied term and condition of unit employment. But our search of the record reveals only a few passing and quite general references to the implied term theory. We can find no reference to the specific theory adopted by the Board, which places crucial emphasis on the unit-specificity of the practice. In sum, we find nothing that would

suggest to Keystone the need to present evidence rebutting the conclusion that the full payment practice was unit-specific.

We have found only two references by the General Counsel to the implied term theory, one in her opening statement and one in the Brief in Support of Exceptions to the ALJ's Decision. In her opening statement, the General Counsel suggested that, "[o]nce Respondent created these management pension benefits and administered them with a policy over the years that permitted unit employees to collect full benefits from the Management Plan when they retired from the unit under the 30 and out option of the Union Plan, Respondent had made application of this policy a term and condition of employment which could not be changed without bargaining with the Union." Hearing Transcript at 19. In her Brief in Support of Exceptions to the ALJ's Decision, the General Counsel advanced the implied term theory in similar terms, arguing that unit employees developed an "expectation for certain entitlements" that derived "from the practice of the Respondent in administering" the pension plans. General Counsel Brief at 17.

What is dispositive to the Board's decision on the implied term theory, however, is its conclusion that the practice of paying out Management Plan benefits under the Union Plan's thirty-and-out option was "an enhanced pension benefit available *only to unit employees*," *Keystone*, 309 N.L.R.B. at 296 (emphasis added), and that it was, for this reason, an implied term of *unit employment*. This understanding of the implied term— that it derived from a unit-specific practice— is critical to the Board's decision, but the General Counsel neither articulated this understanding nor presented evidence to support it. To the contrary, the General Counsel suggested that the practice of paying Management Plan benefits under the Union Plan's thirty-and-out option may not have been unit-specific, urging that "[t]he fact that these matters concern as well the pension benefits of retirees and non-unit personnel does not require a different result. Where, as here, matters entailing retirees and non-unit personnel vitally affect the terms and conditions of unit employees, they are man-

datory subjects notwithstanding their scope beyond the unit." General Counsel's Brief in Support of Exceptions at 15. By the General Counsel's theory, then, unit-specificity was irrelevant.

Nor was there any reference in the ALJ's decision to the argument that a unit-specific practice arose and became an implied term of unit employment. To the contrary, the finding that a unit-specific practice existed appears for the first time in the Board's order reversing the ALJ. The absence of argument and evidence that an implied term arose from a unit-specific practice persuades us that Keystone was not on notice that the Board might decide the case on these grounds. Because it lacked notice, the company cannot be charged with the knowledge that it had to introduce evidence refuting the conclusion that the practice was unit-specific. We therefore conclude that the case must be remanded for the Board to hear full evidence on whether the full payment practice was unit-specific.

Keystone's evidentiary challenge warrants some independent discussion. This challenge appears to have two tiers, only one of which we think valid. In order to frame the issues for the Board's consideration on remand, we first dispose of Keystone's invalid challenge. Keystone devotes much of its argument to charges that there is no evidence that the beneficiaries of the practice—the Affected Retirees—were *bona fide* unit employees. Keystone suggests instead that, to the extent that the beneficiaries were even nominally connected to the unit, they were management employees who merely made paper transfers back into the unit prior to retirement in order to retire under the Union Plan.

█ Assuming for the moment that the Affected Retirees retired from unit positions, there is no evidence in the record as to whether they were bona fide or paper transfers, or some combination thereof. There were, however, 36 dual participants who were bona fide unit employees at the time Keystone terminated the practice—the Group III employees. As long as (1) there is a unit-specific practice, and (2) bona fide unit employees legitimately expect to benefit from that practice, the Board need not necessarily recognize any distinction between bona fide employees and "paper transferees." *Cf. Beitler–McKee Optical Co.,* 287 N.L.R.B. 1311, 1312 (1988) (company's unilateral revocation of family health insurance benefits violates duty to bargain even though all current employees are single; these benefits create future entitlements that "clearly constitut[e] a term and condition of employment whether established pursuant to a collective-bargaining agreement or not"). Thus, even if Keystone shows that all of the Affected Retirees were "paper transferees" rather than bona fide unit employees, the Board could still be justified in concluding, in light of all the evidence, that the practice was conditioned on their status as unit employees.

█ The second tier of Keystone's evidentiary challenge, however, is more persuasive. Here, Keystone challenges the Board's conclusion that the full payment policy was linked to unit employment at all, even as to the technical requirement of returning to the unit via a "paper transfer." The record on this point is decidedly murky. Although Keystone in its brief appears to concede at times that the practice required a paper transfer to the unit, characterizing "the practice" as one that "allowed management employees to make a paper transfer into the bargaining unit at the time they retired," Keystone Brief at 20, there is no evidence of this requirement in the record. The record is also totally silent as to the pre-retirement status of the Affected Retirees. We do not know if the Affected Retirees retired from management or unit positions. Nor is there any evidence in the record before us of a relation between any paper transfer policy that may have existed and full Management Plan payments. Even in a supplementary letter filed at our request, the Board can point to nothing in the record to support its conclusion that Keystone "provided an enhanced pension benefit available only to unit employees." *Keystone,* 309 N.L.R.B. at 296. As Keystone did not have adequate notice of the Board's implied term theory—notice which would have prompted it to introduce any contrary evidence—and as the bareboned essentials to prove that theory are

nowhere developed in the record, we conclude that a remand is necessary so that sufficient evidence on the issue may be developed. On remand, the Board should hear evidence as to whether the full payment practice was, in fact, linked to unit employment only. In particular, the Board should determine whether the Affected Retirees retired from unit positions—subsequent to paper transfers or otherwise. If all the Affected Retirees did retire from unit positions, and if there is no other evidence refuting the unit-specificity of the practice, the Board may presume that the practice was a term and condition of unit employment. Keystone may, however, offer evidence that would disprove unit-specificity, even if the Affected Retirees did retire from unit positions. If Keystone shows that the administrative practice of providing full Management Plan payments was unrelated to unit status—that, for instance, the transfer policy was only related to the medical plan, and full pension payments would have been available to all dual participants, regardless of unit or non-unit status—then the Board cannot conclude that the practice was unit-specific simply because all its actual beneficiaries were unit employees at the time of retirement.

### III. "VITALLY AFFECTS" DOCTRINE

■ Under the "vitally affects" doctrine, "[a] matter involving the employer's relationship with a third party may be subject to mandatory bargaining ... if such matter 'vitally affects the "terms and conditions" of ... employment' of employees within the bargaining unit." *U.S. Dept. of Navy v. FLRA,* 952 F.2d 1434, 1440 (D.C.Cir.1992) (quoting *Pittsburgh Plate Glass,* 404 U.S. at 179, 92 S.Ct. at 398). Under this doctrine, for instance, the compensation of independent truck drivers has been held within the scope of collective bargaining with union truck drivers, because if independent truck driver compensation undercut union wages, it could "threaten the maintenance of the basic wage structure established by the collective bargaining contract." *Local 24, Internation-*

*al Brotherhood of Teamsters v. Oliver,* 358 U.S. 283, 294, 79 S.Ct. 297, 304, 3 L.Ed.2d 312 (1959).[3]

■ In its brief, the Board advances the "vitally affects" theory as an alternative ground for its decision. It argues that the change in administration of the Management Plan, whereby dual participants are no longer afforded Management Plan benefits under the Union Plan's thirty-and-out option, "vitally affects" unit employees because it "resulted in a situation where employees accruing rights toward full benefits after 30 years of combined service would have to delay retirement until they reached the minimum age for eligibility under the Management Plan in order to receive that same full benefit." NLRB Brief at 23.

Although the Board advances the "vitally affects" theory in its brief on appeal, it is not clear that it relied on this theory in its final order. It seems to approve the theory in a footnote, *Keystone,* 309 N.L.R.B. 297 n. 6, and to have relied on the "vitally affects" doctrine in its original order, in which it demanded that Keystone cease and desist from making any unilateral changes in its Management Plan that would "adversely affect[ ] unit employees." *Keystone,* 309 N.L.R.B. at 298. In partially granting Keystone's Motion for Reconsideration, however, the Board restricted the scope of its order to address only the particular, allegedly unit-based, practice that Keystone had followed with respect to the Management Plan. *Keystone Steel & Wire Division of Keystone Consolidated Industries, Inc.,* No. 33–CA–8519 (N.L.R.B., May 12, 1993) (order granting motion for reconsideration in part). The modified order did not bar *all* changes to the Management Plan that would adversely affect unit employees; it only barred changes to the particular practice at issue—which it found to be Keystone's unit-based policy of allowing full pension benefits under the Union Plan's eligibility criteria to dual participants who retired from the unit. In its modified order, then, the Board seems to

3. Though the *Oliver* Court did not use the "vitally affects" language, the Court subsequently characterized the *Oliver* decision as one relying on the "vitally affects" doctrine. *See Pittsburgh Plate Glass,* 404 U.S. at 179, 92 S.Ct. at 397–98.

have abandoned reliance on the "vitally affects" theory.

■ As the Board stands behind the "vitally affects" theory of this case in its brief on appeal, however, we address its merits. At the outset, we note that the implied term and "vitally affects" theories are mutually exclusive. "The 'vitally affects' test is relevant ... *only when a union seeks to bargain over a matter that would not normally be viewed as within the scope of mandatory bargaining.*" *U.S. Dept. of Navy v. FLRA*, 952 F.2d at 1440 (emphasis in original). Thus, the "vitally affects" doctrine is relevant only if there is no unit-specific practice. For purposes of our discussion of the "vitally affects" doctrine in this case, therefore, we assume that there was no unit-specific practice.

In *Torrington Co.*, 305 N.L.R.B. 938 (1991), *reh'g denied,* 307 N.L.R.B. 485 (1992), the Board held that changes in the family health benefits of non-unit employees—which affected unit members because they could no longer get health benefits through their non-unit spouses—was not encompassed under the "vitally affects" doctrine. It concluded that the effect of the change in non-unit benefits on unit employees did not make it a mandatory subject because the effect "flowed from the change in nonunit employment benefits rather than from any change in benefits available to unit employees." 305 N.L.R.B. at 939. In this case, there is a change in the benefits available to those unit employees who happen to have worked in management in the past. But the change is completely unrelated to employment in the *unit*. It is solely the result of past employment in supervisory work. In *Teamsters v. Oliver, supra*, by contrast—one of the few cases we have identified in which the "vitally affects" test was found to be met—the "vital effect" was on the wage structure that governed actual union employment, not on the benefit package of particular employees based on their deferred compensation from other sources. Changes in administration of the Management Plan do not "vitally affect" the terms and conditions of *unit* employment; they only affect the financial interests of unit employees who happen to have been management employees in the past.

Concluding that the incidental effect of Management Plan changes on unit employees with non-unit work experience brings the Management Plan into the "vitally affects" doctrine would make the entire Management Pension Plan a mandatory subject of bargaining whenever any unit members had worked for management in the past. As this court has noted, this result would be contrary to the design of the National Labor Relations Act, which excludes supervisory employees from union representation, *see* 29 U.S.C. § 152(3) ("employee" under the Act "shall not include ... any individual employed as a supervisor"), and "[w]e are ... aware of no case in which a union has been permitted to bargain over the conditions of employment of excluded supervisory personnel" under the "vitally affects" doctrine. *U.S. Dept. of Navy*, 952 F.2d at 1442.

In sum, we find, as the Board itself may have belatedly realized, that the "vitally affects" theory has no application to this case.

### IV. CONCLUSION

In accordance with the opinion above, the Board's order is reversed and the case remanded for further proceedings.

*Reversed and remanded.*