**WHITE MOTOR CORPORATION and White Farm Equipment Company, Plaintiffs,**

v.

**E. I. MALONE, Commissioner of Labor and Industry for the State of Minnesota, Defendant.**

No. 3–75 Civ. 162.

United States District Court, D. Minnesota, Third Division.

March 19, 1976.

## MEMORANDUM AND ORDER

ALSOP, District Judge.

This matter is presently before the court on motions by all parties. Plaintiffs are seeking a summary judgment, or in the alternative, a preliminary injunction on Count I of the Amended Complaint; defendant is requesting the court to abstain. Plaintiffs have brought this action challenging the constitutionality of the Minnesota Private Pension Benefits Protection Act, Minn.Stat. § 181B.01 *et seq.* (1974) (hereinafter the "Minnesota Pension Act").

Plaintiff White Motor Corporation (hereinafter "White Motor") is an Ohio corporation with its principal place of business in Cleveland, Ohio. White Farm Equipment Company (hereinafter "White Farm") is a Delaware corporation with its principal place of business in Oakbrook, Illinois and is a wholly owned subsidiary of White Motor.

The defendant, E. I. Malone, is the Commissioner of Labor and Industry for the State of Minnesota and is obligated to perform certain duties under the Minnesota Pension Act.

The facts giving rise to the dispute between the parties are lengthy. In 1962, White Motor organized a subsidiary, Minneapolis-Moline, Inc. Minneapolis-Moline, Inc. on January 1, 1963 acquired the assets of Motec Industries, Inc. (formerly called the Minneapolis-Moline Company) which had operated farm manufacturing plants at Hopkins, Minnesota and Minneapolis, Minnesota, on Lake Street. In 1969 Minneapolis-Moline, Inc. changed its name to White Farm. White Farm still operates the Hopkins plant but closed the Lake Street plant in June, 1972.

In 1950, a pension plan was established for the employees of the predecessor of White Farm. This pension plan was carried forward in some form in each of the subsequent years that collective bargaining agreements were entered into: 1954, 1959, 1962, 1965, 1968 and 1971. Since 1955, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and certain of its local

Curtis L. Roy, and Peter Hendrixson, Dorsey, Marquart, Windhorst, West & Halladay, Minneapolis, Minn., together with Frank C. Heath, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for plaintiffs.

Warren Spannaus, Atty. Gen., State of Minnesota by James P. Gerlach, Richard S. Slowes, and Kathryn A. Rush, Sp. Asst. Attys. Gen., St. Paul, Minn., for defendant.

unions (hereinafter collectively referred to as the "UAW") have been the bargaining representatives for production and maintenance employees and clerical employees at the Lake Street and Hopkins plants.[1] Pension benefits resulting from collective bargaining agreements continued to increase after the purchase of Motec Industries by White Motor in 1963.

The 1971 version of the pension plan is the plan pertinent to this action. The 1971 plan contained a provision, first inserted in the 1968 plan, requiring the funding of unpaid past service liability. Unpaid past service liability is at any given time, the excess of the accrued liability of the pension fund over the present value of the assets of the fund. The 1971 plan provided:

*Section 9.05*

The unfunded net deficiency as of January 1, 1971 shall be amortized over a thirty-five (35) year period from January 1, 1971. The deficiencies resulting from benefit increases effective January 1, 1972 and January 1, 1973 shall be funded uniformly over a thirty-five (35) year period from January 1, 1972 and January 1, 1973 respectively.

Deferred funding of past service liability is a common feature of pension plans. In essence, past service liability is met by continued business operations and continued contributions by the employer to the pension fund. If the plan is terminated, the pension fund will not be increased and as a result some past service liability will remain unfunded.

In language unchanged since the 1950 pension plan, the 1971 plan provided for the payment of pensions as follows:

*Section 6.09—Source of Pensions*

Pensions shall be payable only from the Fund and rights to pensions shall be enforceable only against the Fund.

\* \* \* \* \* \*

*Section 6.17—No Other Benefits*

No benefits other than those specifically provided for are to be provided under this Plan. No employee shall have any vested right under the Plan prior to his retirement and then only to the extent specifically provided herein.

\* \* \* \* \* \*

*Section 9.04—Rights of Employees in the Fund*

No employees, participant or pensioner shall have any right to, or interest in, any part of any Trust Fund created hereunder, upon termination of employment or otherwise, except as provided under this Plan and only to the extent therein provided. All payments of benefits as provided for in this Plan shall be made only out of the Fund or Funds of the Plan and neither the Company nor any Trustee nor any Pension Committee or Member thereof shall be liable therefor in any manner or to any extent.

During the 1968 and 1971 negotiations with UAW, Pension Guarantees applicable to the Lake Street and Hopkins plants were given by White Motor. These Guarantees provided that, upon termination of the pension plan, benefits were guaranteed by White Motor at a designated benefit level. By giving the Guarantees, White Motor assumed a direct liability of approximately $7,000,000.

After suffering substantial losses from 1969 to 1971 at its Minneapolis-Moline Division, White Motor in January, 1972 informed the UAW that it intended to close its Minneapolis-Moline plants. Operations at the Lake Street plant were terminated in June 1972 and the plant was closed and the building subsequently razed. Operations at the Hopkins plant have continued.

Section 10.02 of the pension plan provided that "[t]he Company shall have the sole right at any time to terminate the entire Plan." Relying on this language, White Motor attempted to terminate the pension plan on June 30, 1972. The UAW challenged White Motor's attempt to terminate

---

**1.** Prior to 1955, the employees were represented by Local 1146 of the United Electrical, Radio and Machine Workers of America.

the plan prior to expiration of the collective bargaining agreement. An arbitrator's award and subsequent litigation upholding that award determined that the plan could not be terminated until the expiration of the collective bargaining agreement on May 1, 1974.[2] The pension plan was thereafter terminated on May 1, 1974.

At the time the Lake Street plant was closed, the pension fund was only partially funded and there was a net deficiency in the fund of approximately $14,000,000.

As of January 1, 1975 there were 981 retirees under the pension plan and 233 persons eligible for deferred pensions by reason of having attained age 40 and 10 years of service at the time of the termination of their employment with White Farm. In addition there were 44 terminated employees who at the time of the termination of their employment had 10 years of service but had not attained the age of 40. Ten years of continuous service is the minimum number of years an employee must have worked for White Motor before becoming eligible for benefits under the plan, but to be so eligible, he must also have attained the age of 40. As of January 1, 1975 there were 260 active employees at the Hopkins plant who were participants in the plan.

On April 10, 1974, the Minnesota Pension Act, Minn.Stat. § 181B.01 et seq., was enacted into law. The title of the Act describes it as

"[a]n act relating to private pensions; imposing an obligation upon certain employers who terminate pension plans; providing for the enforcement and method of payment of such obligations." Minn. Laws 1974, ch. 437.

Minn.Stat. §§ 181B.03–.06 impose a "pension funding charge" directly against any employer who ceases to operate a place of employment or a pension plan. Such charge shall be equal in amount to the vested and nonvested benefits described in the statutory provisions. These sections essentially provide that any employee who has completed ten or more years of credited service under a pension plan has, upon ter-

mination of that plan or of his place of employment, an automatically vested right to all pension benefits he would have received had the particular plan not been terminated or had the place of business not been closed.

Minn.Stat. §§ 181B.09–.12 provide that the Commissioner of Labor and Industry, after investigation, shall certify amounts owing by an employer. That certified amount is declared, under § 181B.11, to "be a lien upon the employer's assets." The pension funding charge is used to purchase an annuity payable to the employee when he reaches normal retirement age.

Pursuant to the provisions of the Pension Act, Malone notified White Motor and White Farm on August 18, 1975 that they owed a pension funding charge of $19,150,053.

Plaintiffs contend that the Pension Act conflicts with the pension plan in the following manner: (1) the Act provides employees vested rights to pension benefits which would not be available under the plan. Compare §§ 181B.03–.06 with Sections 6.17 and 9.04 of the plan; (2) to the extent of any deficiency in the pension fund, the Act requires satisfaction of pension benefits from the general funds of the employer. §§ 181B.03–.06. The pension plan provides that benefits shall be paid only out of the pension fund and that the Company shall not be liable to any extent. Sections 6.09 and 9.04 of the plan; and (3) the Act completely changes the consequences of terminating the pension plan.

## PROCEDURAL POSTURE

Plaintiffs filed their original complaint in May, 1975 alleging that the Minnesota Pension Act is unconstitutional on several grounds. In July, 1975 plaintiffs amended their complaint to include an allegation that the Act is in conflict with the provisions and policies of the National Labor Relations Act, 29 U.S.C. § 151 et seq., and thus is preempted under the Supremacy clause of the United States Constitution.[3]

---

2. See, International Union, etc. v. White Motor Corp., 505 F.2d 1193 (8th Cir. 1974).

3. Art. VI, cl. 2.

Plaintiffs have moved for a partial summary judgment solely on their preemption claim. Fed.R.Civ.P. 56. In the alternative, plaintiffs seek a preliminary injunction, also based only on the preemption claim, to enjoin the enforcement of the Minnesota Pension Act by the defendant. Defendant has moved the court to abstain from hearing this action pending state construction of the Minnesota Pension Act.

 The plaintiffs' amended complaint seeks only a declaratory judgment that the Pension Act is invalid. The motion for partial summary judgment for declaratory relief is properly heard by a single judge. Plaintiffs' alternative request for a preliminary injunction is carefully based only on preemption. A request for an injunction based on a preemption challenge to a state statute does not require the convening of a three-judge court. *Swift & Co. v. Wickham*, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). Furthermore, where a statute is challenged both on preemption grounds and other constitutional grounds, the court, sitting as a single judge, should decide the preemption issue first. *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

The scope and the basis of relief sought is significant for it differs with the relief sought in *Fleck et al. v. Spannaus et al.*, (File No. 3–75 Civ. 178) 412 F.Supp. 366 (D.Minn.1976), also issued today. The court expended considerable effort in attempting to place the two cases in an identical procedural posture and reluctantly concludes that its attempt to produce a "Brobdingnagian" result was unsuccessful.[4]

Fed.R.Civ.P. 56(c) provides that summary judgment is proper where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Minnesota Bearing Co. v. White Motor Corp.*, 470 F.2d 1323 (8th Cir. 1973), sets forth the standard for the issuance of a preliminary injunction:

In order to justify the issuance of a preliminary injunction by the trial court, the movant has the burden of showing: (1) substantial probability of success at trial by the moving party, and (2) the irreparable injury to the moving party absent such issuance. Other factors which may be considered in the decision to grant or to deny the request are the absence of substantial harm to other interested parties, and the absence of harm to the public interest.

470 F.2d at 1326.

The court will examine defendant's motion to abstain before considering plaintiffs' alternative motions of summary judgment or preliminary injunction.

## ABSTENTION

Defendant has moved for abstention on the grounds that state administrative or court proceedings may eliminate or substantially modify plaintiffs' federal challenge to the Act.

 Abstention cases have generally "... dealt with unresolved questions of state law which only a state tribunal could authoritatively construe." *Wisconsin v. Constantineau*, 400 U.S. 433, 438, 91 S.Ct. 507, 511, 27 L.Ed.2d 515, 520 (1971). Abstention is justified where the state statute is susceptible to a clarifying construction that would alter or eliminate the constitutional question. *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 510, 92 S.Ct. 1749, 1757, 32 L.Ed.2d 257, 268 (1972); *Zwickler v. Koota*, 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444, 451 (1967). It is not proper to abstain "... simply to give

---

4. Professor Chafee once wrote, "The King of Brobdingnag gave it for his opinion that, 'whoever could make two ears of corn, or two blades of grass to grow upon a spot of ground where only one grew before, would deserve better of mankind, and do more essential service to his country than the whole race of politicians put together.' In matters of justice, however, the benefactor is he who makes one lawsuit grow where two grew before." *Bills of Peace with Multiple Parties*, 45 Harv.L.Rev. 1297 (1932).

state courts the first opportunity to vindicate the federal claim." *Zwickler v. Koota, supra* at 251, 88 S.Ct. at 397, 19 L.Ed.2d at 452.

Defendant has failed to indicate to the court any statutory provisions involved in this case which might be construed by a state court so as to modify the federal question being considered. Nor has defendant contended that the state administrative proceeding might relieve plaintiffs of any liability. The present controversy requires the court to construe a federal law, a task which is best performed by a federal court. *See Chemical Specialties Manufacturers Ass'n v. Lowery*, 452 F.2d 431, 433 (2d Cir. 1971).

Accordingly, defendant's motion to abstain will be denied.

### SUMMARY JUDGMENT

Plaintiffs contend that they are entitled to summary judgment on the grounds that the Minnesota Pension Act is in conflict with, and preempted by, the provisions and policies of the National Labor Relations Act, as amended, 29 U.S.C. §§ 151, 157, 158(a)(5), 158(b)(3), and 158(d). Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, (hereinafter NLRA) establishes the right of employees to form and join labor organizations and to bargain collectively through representatives of their own choosing. Sections 8(a)(5), 8(b)(3) and 8(d) of the NLRA require employers and labor organizations to bargain in good faith with respect to "wages, hours and other terms and conditions of employment. . . ."

■ It has been established that pension plans fall within the category of "wages and other terms and conditions of employment", and are therefore mandatory subjects of bargaining under the NLRA. *Inland Steel Co. v. NLRB*, 170 F.2d 247 (7th Cir. 1948), *cert. denied*, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949). Plaintiffs assert that since they were required to bargain in good faith over pension benefits and having reached an agreement on a pension plan, a state statute which conflicts with the terms of that agreement infringes on the national policy of collective bargaining and thus has been preempted under the Supremacy clause by the statutes embodying federal labor policy.

The concept of preemption was explained in *Amalgamated Ass'n of Street Employees v. Lockridge*, 403 U.S. 274, 285–286, 91 S.Ct. 1909, 1917, 29 L.Ed.2d 473, 482 (1971), where the Court stated:

> The constitutional principles of preemption, in whatever field of law they operate, are designed with a common end in view: to avoid conflicting regulation of conduct by various official bodies which might have some authority over the subject matter.

The method for determining whether a conflict exists has been addressed by the Supreme Court:

> Deciding whether a state statute is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict.

*Perez v. Campbell*, 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233, 239 (1971).

*Construction of the Statutes*

The Minnesota Pension Act has not been construed by any judicial body—state or federal. However an analysis of the Act indicates the protection it seeks to provide.

The title of the Act describes it as "[a]n act relating to private pensions; imposing an obligation upon certain employers who terminate pension plans; providing for the enforcement and method of payment of such obligations." Minn. Laws 1974, ch. 437.

Through the imposition of a "pension funding charge", the Act protects employees with ten or more years of credited service under a pension plan from forfeiture of those pension benefits. Minn.Stat. §§ 181B.03–.06. The protection is provided by using the pension funding charge to

purchase an annuity that will provide the protected employee with monthly pension benefits after his normal retirement age. Minn.Stat. § 181B.12. The pension funding charge is assessed directly against the employer when it ceases to operate a place of employment in Minnesota leaving a substantial number of employees unemployed, or if it terminates a pension plan. Minn. Stat. §§ 181B.03–.06.

The NLRA has been authoritatively construed by the Supreme Court on numerous occasions. It has been described as " . . . a comprehensive code passed by Congress to regulate labor relations in activities affecting interstate and foreign commerce." *Nash v. Florida Industrial Commission*, 389 U.S. 235, 238, 88 S.Ct. 362, 365, 19 L.Ed.2d 438, 442 (1967).

> The NLRA is
> " . . . designed to promote industrial peace by encouraging the making of voluntary agreements governing relations between unions and employers. The Act does not compel any agreement whatsoever between employees and employers. Nor does the Act regulate the substantive terms governing wages, hours and working conditions which are incorporated in an agreement." [footnotes omitted]

*Labor Board v. American National Insurance Co.*, 343 U.S. 395, 401–402, 72 S.Ct. 824, 828, 96 L.Ed. 1027, 1036 (1952); *See Labor Board v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893, 916 (1937).

*Question of Conflict*

With the construction of the statutes considered, the question presented is whether state regulation of pensions is in conflict with and thus preempted by the NLRA and its policies.

1. Labor Law Preemption

The well developed law surrounding labor preemption has focused on primarily two areas: (1) regulation of labor-management relations and labor disputes, and (2) regula-tion of conduct of a union towards an individual member. *See* Cox, *Labor Law Preemption Revisited*, 85 Harv.L.Rev. 1337 (1972). As a consequence, the "test" for determining whether State decisional or statutory law is preempted is a result of litigation in those areas. The principles established in those cases are helpful in analyzing the claims of the plaintiffs herein, but nonetheless the court is still left with a case of first impression concerning the permissible extent of state regulation of employee pension funds.

The established standard for labor law preemption was enunciated in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In *Garmon* the Supreme Court overturned a state court's award of damages for economic injuries resulting from peaceful picketing. The status of the picketing was uncertain under the NLRA, since the Labor Board had not ruled on the question. The court explained its restriction on state court jurisdiction saying:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. . . .
> At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections. . . . When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

The *Garmon* "arguably protected or prohibited" test was reaffirmed in *Amalgamat-*

*ed Ass'n of Street Employees v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), in the context of an employee-union controversy.

Section 7 prescribes the protected rights of employees. There are no employees party to the present action contending that their rights have been interfered with.

Section 8 of the NLRA requires employers and labor organizations to bargain in good faith over "wages, hours and other terms and conditions of employment . . . .", which would include pensions. The employer's duty to bargain in good faith over pensions is not altered by the Pension Act. The Pension Act does not require labor and management to agree to a pension plan or that specific provisions be included in a pension plan.

■ The NLRA does not regulate the substantive terms of a collective bargaining agreement. *Labor Board v. American National Insurance Co., supra,* 343 U.S. at 402, 72 S.Ct. at 828, 96 L.Ed. at 1036.

■ The danger addressed in *Garmon* is not presented by the facts of the present action. The state is not attempting to regulate a subject matter which lies within the exclusive competence of the National Labor Relations Board. The Pension Act does not " . . . regulate conduct so plainly within the central aim of federal regulation involv[ing] too great a danger of conflict between power asserted by Congress and requirements imposed by state law. . . . " *Garmon, supra,* 359 U.S. at 244, 79 S.Ct. at 779, 3 L.Ed.2d at 782.

### 2. Congressional Intent

■ Although the Pension Act does not seem on its face to conflict with the regulatory scheme of the NLRA, it is nonetheless the court's function

" . . . to determine whether [the] challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress.' *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). [further citations omitted]

*Perez v. Campbell, supra,* 402 U.S. at 649, 91 S.Ct. at 1711, 29 L.Ed.2d at 642.

Plaintiffs contend that the purpose and objective of Congress which is being frustrated by the Pension Act is the collective bargaining process. This frustration allegedly occurs because labor and management agreed to a provision in a collective bargaining agreement covering the termination of the pension plan and now the State of Minnesota seeks to apply a law which would effectively alter the agreed-to provision.

■ A court cannot " . . . declare pre-empted all local regulation that touches and concerns in any way the complex interrelationships between employees, employers, and unions; obviously much of this is left to the States." *Lockridge, supra,* 403 U.S. at 289, 91 S.Ct. at 1920, 29 L.Ed.2d at 484. It is recognized that Congress developed its special framework of labor laws within a larger context of state laws which provide for rights of property, public order and the promotion of public health and welfare. Cox, *Labor Law Preemption Revisited, supra,* at 1355.

■ In examining Congressional intent it should be recognized that "the principle of pre-emption that informs our general national labor law was born of [the Supreme] Court's efforts, without the aid of explicit congressional guidance. . . . " *Lockridge, supra,* 403 U.S. at 286, 91 S.Ct. at 1918, 29 L.Ed.2d at 482. Although Congress has not given explicit guidance in the NLRA of the extent that it desired to pre-empt state laws of the type here being challenged, it has given indications in other laws that legislation and regulation by the States of various subject matter would be permissible.

For example, Congress indicated in the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* that States could establish a higher minimum wage than was required by feder-

al law.[5] Such state requirements can be imposed even though wages are a mandatory subject of collective bargaining.

In a similar vein, the Supreme Court looked to Congress' affirmative indications in another enactment when it held that an employee could bring an action in state court against his employer for breach of a collective bargaining agreement even though the employer's action was an unfair labor practice under Section 8 of the NLRA and thus within the jurisdiction of the National Labor Relations Board. *Smith v. Evening News Association,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

Relevant to the state statute being challenged by the plaintiffs was the expression of Congressional intent for state regulation of pensions when Congress enacted the Welfare and Pension Plans Disclosure Act (hereinafter the "Pension Disclosure Act"), 29 U.S.C. § 301 *et seq.*[6] Congress expressly provided that states should remain free to become involved in the regulation of pension plans when it stated:

> The provisions of this chapter . . . shall not be held to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law . . . of any State affecting the operation or administration of

employee . . . pension benefit plans. . . .

29 U.S.C. § 309(b).

The legislative history of the Pension Disclosure Act further emphasizes the regulatory power retained by the states. The Senate Report stated:

> . . . [The Pension Disclosure Act] is a disclosure statute and by design endeavors *to leave regulatory responsibility to the States.*
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> . . . It is designed to place the primary responsibility for the policing and improved operations of these plans upon the participants themselves, with a minimum of interference in the natural development and operation of such plans, *to leave to the States the detailed regulations relating to insurance, trusts, and other phases of their operations,* and to place the least possible burden by way of cost and otherwise upon the plans and upon the Federal Government. [emphasis added]

S.Rep. No. 1440, 85th Cong., 2d Sess. (1958), 1958 *U.S.Code Cong. and Adm.News* 4137, 4153–4154.

Moreover, Congress was specifically aware that pension plans were often the

---

5. Section 18(a) of that Act, 29 U.S.C. § 218(a) provides as follows:

No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter, and no provision of this chapter relating to the employment of child labor shall justify noncompliance with a Federal or State law or municipal ordinance establishing a higher standard than the standard established under this chapter. No provision of this chapter shall justify any employer in reducing a wage paid by him which is in excess of the applicable minimum wage under this chapter, or justify any employer in increasing hours of employment maintained by him which are shorter than the maximum hours applicable under this chapter.

6. The Pension Disclosure Act was the controlling pension statute in effect when the Minnesota Pension Act was enacted. Subsequently, the Employee Retirement Income Security Act (ERISA), a comprehensive pension reform law, was enacted by Congress. 29 U.S.C. § 1001 *et seq.* ERISA specifically repealed the Pension Disclosure Act, 29 U.S.C. § 1031, and replaced it with new reporting and disclosure provisions. 29 U.S.C. §§ 1021–1031.

ERISA also sought to avoid all future questions of preemption by specifically providing for the superseding of all state laws relating to employee benefit plans. 29 U.S.C. § 1144. Since ERISA with its preemption provision was enacted after the occurrences which give rise to the present case before the court, plaintiffs have not sought to avail themselves of any of its provisions or legislative history. Compare with *Fleck et al. v. Spannaus et al.,* 412 F. Supp. 366 (D.Minn.1976), also issued today.

product of the collective bargaining process. *See, e. g.*, S.Rep. No. 1440, 85th Cong., 2d Sess. (1958), 1958 *U.S.Code Cong. and Adm. News* 4137, 4143–4144; H.Rep. No. 2283, 85th Cong., 2d Sess. (1958), 1958 *U.S.Code Cong. and Adm.News* 4181, 4188–4189. Thus Congress was not unmindful that it was permitting States to regulate a subject matter which was the product of collective bargaining.

### 3. Collective Bargaining Agreement

Plaintiffs assert that a state's attempt to regulate a subject matter of collective bargaining, such as employee pensions, should not be permitted where that regulation conflicts with the collective bargaining agreement.

In support of their position, plaintiffs place heavy reliance on *Local 24, Teamsters v. Oliver*, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959).

In *Oliver* a group of local labor unions had entered into a collective bargaining agreement with a group of interstate motor carriers providing the wage scale for truck drivers and the minimum rental for drivers who used their own vehicles. A state court enjoined certain carriers and a local union from carrying out the minimum rental provision on the grounds that it violated state antitrust law. However, the Supreme Court held that state antitrust law could not be applied to prohibit the parties from carrying out the terms of its collective bargaining agreement. The Court stated:

> To allow the application of the Ohio antitrust law here would wholly defeat the full realization of the congressional purpose. The application would frustrate the parties' solution of a problem which Congress has required them to negotiate in good faith toward solving, and in the solution of which it imposed no limitations relevant here.

358 U.S. at 295–296, 79 S.Ct. at 304, 3 L.Ed.2d at 321.

State antitrust statutes present unique problems in the area of labor preemption. The Supreme Court has consistently held that the NLRA precludes their application to appropriate labor union activities. *See, e. g. Connell Construction Co. v. Plumbers & Steamfitters*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975); *Weber v. Anheuser-Busch, Inc.*, 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546 (1955). Antitrust laws are designed primarily to apply to business combinations and their application to collective action by employees would produce a direct conflict with the national labor policy. The Court has stated that:

> [p]ermitting state antitrust law to operate in [the labor] field could frustrate the basic federal policies favoring employee organization and allowing elimination of competition among wage earners, and interfere with the detailed system Congress has created for regulating organizational techniques.

*Connell, supra,* 421 U.S. at 636, 95 S.Ct. at 1842, 44 L.Ed.2d at 434.

■ The inherent conflict and delicate balance which exists between labor and antitrust policy does not exist between labor policy and the regulation of pensions. Congress, in formulating its policies, has indicated that states may regulate pensions. Accordingly, the court concludes that the Minnesota Pension Act does not necessarily stand as an obstacle to the accomplishment of the purposes and objectives of Congress. The broad language of *Oliver* does not require the striking down of the Pension Act.

Plaintiffs have also relied on the following cases which merit comment: *Railway Employees' Dept. v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); *California v. Taylor*, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957); *United Air Lines, Inc. v. Industrial Welfare Comm'n*, 211 Cal. App.2d 729, 28 Cal.Rptr. 238 (1963). Although it may not be a significant distinction, all of the above cases were decided under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* An important distinction, however, is that none of the cases dealt with a state's efforts to regulate a subject matter which Congress had specifically indicated they could regulate. The court also

finds persuasive the distinction of the cases on their facts and the quality of state regulation involved as argued by the defendant in its supporting memoranda.

Based upon the foregoing, the court is not persuaded that the NLRA and its policies preempt the state regulation of pensions embodied in the Minnesota Pension Act. The court is not ruling on the validity of the Pension Act vis-a-vis any other law or constitutional provision since none has been presented to it. Plaintiffs' motion for summary judgment will be denied.

### PRELIMINARY INJUNCTION

In the alternative, plaintiffs have moved for a preliminary injunction against the defendant. Plaintiffs have so moved on the same grounds as their request for summary judgment—preemption. Based on the analysis of the law recited above in denying plaintiffs' motion for summary judgment, the court concludes that plaintiffs have not shown a substantial probability of success at trial and thus plaintiffs' request for a preliminary injunction will also be denied. The foregoing recitation of facts and statement of law shall constitute the court's Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a).

Upon the foregoing,

IT IS ORDERED That defendant's motion to abstain be, and the same hereby is in all respects denied.

IT IS FURTHER ORDERED That plaintiffs' motion for an order granting summary judgment in favor of plaintiffs, and against defendant, on issues tendered in Count I of plaintiffs' Amended Complaint be, and the same hereby is in all respects denied.

IT IS FURTHER ORDERED That plaintiffs' motion for an order granting a preliminary injunction, upon the grounds set forth in Count I of the Amended Complaint, enjoining the defendant, his agents, representatives and employees, from assessing or certifying a pension funding charge against plaintiffs under the Minnesota Private Pension Act, Minn.Stat. Ch. 181B, and from taking or continuing to take any other action to enforce said statute against plaintiffs, pending a final determination of this cause by this court, be, and the same hereby is in all respects denied.