WALTER J. FLECK AND OTHERS v.
WARREN SPANNAUS AND OTHERS.

251 N. W. 2d 334.

February 18, 1977—No. 47086.

*Briggs & Morgan, John R. Kenefick, Maurice J. McCarthy, Frankel, McKay, Orlikoff, Denten & Kostner,* for plaintiffs.

*Warren Spannaus,* Attorney General, *Richard B. Allyn,* Solicitor General, *Kent G. Harbison* and *Richard A. Lockridge,* Special Assistant Attorneys General, for defendants.

YETKA, JUSTICE.

This case was certified to this court by the United States District Court for the District of Minnesota pursuant to Minn. St. 480.061.[1] By an order dated August 5, 1976, the Federal Court requested a resolution of the following three issues:

"(1)  Upon what date did the Minnesota Private Pension Benefits Protection Act, Minn. Stat. § 181B.01 *et seq.* (1974) (hereinafter the 'Minnesota Pension Act') become null and void pursuant to Minn. Stat. § 181B.17?

"(2)  What effect does the termination of the Minnesota Pension Act have upon any cause of action which may have accrued prior to the date of such termination but upon which no administrative proceeding had been commenced?

"(3)  What effect does the termination of the Minnesota Pension Act have upon any cause of action which was the subject of a pending administrative proceeding on the date of the termination of the Act?"

The plaintiff Allied Structural Steel Company (Allied) is

---

[1] Section 480.061 is the Uniform Certification of Questions of Law Act. For a general discussion of Federal court certification of questions of state law, see, Lillich & Mundy, *Federal Court Certification of Doubtful State Law Questions,* 18 U.C.L.A. L. Rev. 888.

a Delaware corporation having its principal place of business in Illinois.[2] It is in the business of fabricating and erecting structural steel, both for intrastate and interstate commerce. For many years Allied maintained a division office within the State of Minnesota. The duty of this office was to oversee the erection and general construction of steel buildings and bridges located in at least 30 states.

On August 7, 1963, Allied organized the Allied Structural Steel Company Salaried Employees' Pension Plan (Pension Plan). The Pension Plan was for the benefit of salaried employees and qualified as a single-employer plan under § 401 of the Internal Revenue Code of 1954, 26 USCA, § 401.[3] It is not a union plan and none of its participants are union employees. The Pension Plan is administered within the state of Illinois and uses as its depository the Northern Trust Company in Chicago, which is also the trustee for the plan.

Under the plan a salaried employee is entitled to full vesting of his pension for early retirement purposes (1) if the employee is at least 60 years old and has worked 15 continuous years; or (2) if the employee is at least 55 and the total of his age and years of continuous service equals 75; or (3) if the employee is less than 55, and the total of his age and years of continuous service equals 80.

In 1974, the Minnesota Legislature passed the Private Pension Benefits Protection Act (Act). L. 1974, c. 437. Now codified as Minn. St. c. 181B, the Act took effect April 10, 1974, the day

---

[2] The complaint included three other plaintiffs, Walter J. Fleck, a salaried employee of Allied; Edyth A. Hamler, also a salaried employee of Allied, and E. A. Richert, fiduciary of Allied's pension plan. The three-judge court held these individuals lacked standing to challenge the enforceability and constitutionality of the Minnesota Act and therefore dismissed their claims.

[3] Under 26 USCA, § 401, a plan qualifies for favorable tax treatment if it meets certain coverage provisions, one of which requires the inclusion in the plan of a minimum percentage of the total number of employees.

after its enactment. With certain exceptions not raised here,[4] the Act imposes a "pension funding charge" against employers who cease to operate a place of employment or a pension plan within the state on or after April 10, 1974 in a manner which results in the forfeiture of employee pension benefits. The pension funding charge is the present value of the vested and nonvested benefits described in the statutory provisions. These statutes essentially provide that upon termination of the operation of a pension plan or place of employment any employee who has completed at least 10 years of covered service under a pension plan has an automatically vested right to all pension benefits he would have received had the particular plan not been terminated or had the place of business not been closed.[5]

The Act also requires an employer to give prior notice to the commissioner of labor and industry if he intends to cease operations.[6] Upon receipt of the notice, the commissioner is required to investigate to determine the amount of any pension funding charge due and certify the amounts owing by an employer.[7] The amount certified becomes a lien upon the employer's assets.[8] The pension funding charge is to be used to purchase an annuity payable to the employee when he reaches normal retirement age.[9]

In the summer of 1974 Allied began to terminate its division construction office in Minnesota. It discharged 11 of its 30 salaried employees in the state on July 31, 1974. Additional employees have been terminated since that date for various reasons.[10]

Pursuant to § 181B.08 of the Act, Allied notified the Depart-

---

[4] See, Minn. St. 181B.07.

[5] Minn. St. 181B.03 to 181B.06.

[6] Minn. St. 181B.08.

[7] Minn. St. 181B.09 to 181B.11.

[8] Minn. St. 181B.11.

[9] Minn. St. 181B.12.

[10] The Minnesota office finally was closed in February 1975.

ment of Labor and Industry on August 7, 1974, of its intent to terminate its Minnesota division and that some employees already had been terminated. Upon receipt of the notice of termination the commissioner of labor and industry and the administrator of the pension protection division of the Department of Labor and Industry began an investigation of the closing of Allied's Minnesota division and its effect on the pension benefits of the terminated employees.

On September 2, 1974, during the investigation, the Federal Employee Retirement Income Security Act of 1974 (ERISA) was enacted.[11] As finally enacted and codified in 29 USCA, § 1001 et seq., ERISA provides a comprehensive scheme of both tax and labor provisions designed to remedy inequities in the area of private pension plans. See, generally, Snyder, *Employee Retirement Income Security Act of 1974*, 11 Wake Forest L. Rev. 219; Note, 26 Syracuse L. Rev. 539.

In December 1974, this action was begun by Allied, two salaried employees of Allied, one with vested rights under the Pension Plan, and the fiduciary of the Pension Plan. It was filed in Federal District Court for the Northern District of Illinois against the Minnesota Attorney General, the Minnesota Commissioner of the Department of Labor and Industry, and the Administrator of the Minnesota Private Pension Benefits Protection Act. The plaintiffs sought an injunction against the enforcement of the Act; a clarification of the obligations under the terms of the Pension Plan, ERISA, and the Federal tax laws; a declaration that the Act was unenforceable; and the convening of a three-judge court pursuant to 28 USCA, § 2284. The complaint alleged the Act was invalid because ERISA preempted the area, the Act became null and void by its own terms upon the enactment of ERISA, and because the Act violated numerous provisions of the United States Constitution, including the con-

---

[11] Pub. L. No. 93-406, 88 Stat. 832.

tract clause.[12] The action was transferred on a venue ruling to Federal District Court for the District of Minnesota.

On August 18, 1975, the Minnesota Commissioner of the De-

---

[12] U.S. Const. Art. I, § 10, provides, in part: "No state shall * * * pass any * * * law impairing the obligation of contracts * * *." The Minnesota Constitution contains a similar provision. Minn. Const. art. I, § 11.

The complaint alleged: "(a)  The Federal Statute (ERISA) has preempted the field.

"(b)  The Minnesota Act is an unreasonable regulation of Interstate Commerce in violation of Article I, Section 8 of the Constitution of the United States.

"(c)  The Minnesota Act impairs the obligations of an existing contract between Plaintiff Allied and its employees, in violation of Article I, Section 10 of the Constitution of the United States.

"(d)  The Minnesota Act deprives Plaintiff Allied of its property without due process of law in violation of Amendment XIV, Section 1 of the Constitution of the United States.

"(e)  The Minnesota Act contains the following provision:

" 'Sec. 17.  Effective date; effect of federal act in area.
Sections 181B.01 to 181B.17 shall take effect the day following final passage. Provided that sections 181B.01 to 181B.17 shall become null and void upon the institution of a mandatory plan of termination insurance guaranteeing the payment of a substantial portion of an employee's vested pension benefits pursuant to any law of the United States.'
Upon the enactment of ERISA the Minnesota Act became null and void by its own terms.

"(f)  The Minnesota Act is vague and indefinite and uncertain.

"(g)  The Minnesota Act is substantially unfair to the participants and beneficiaries of the Pension Plan who are not covered by said Act.

"(h)  The Minnesota Act fails to provide notice to the person against whose assets a lien is to be imposed.

"(i)  The Minnesota Act fails to provide a hearing and an opportunity to defend against the imposition of a lien upon an employer's assets.

"(j)  The Minnesota Act does not apply to all employers, but only to those employers who have established a pension plan. Such a classification is unreasonable, arbitrary and invidious. The Minnesota Statute thereby violates Amendment XIV, Section 1 of the Constitution of the United States."

partment of Labor and Industry notified Allied of the assessment of a pension funding charge for 13 employees in the total amount of $185,751. In response, Allied applied to the Department of Labor and Industry for a contested case hearing and requested that the pension funding charge not be assessed pending the decision of the Federal District Court on the enjoining of the state administrative proceedings. This request was granted by the hearing examiner.

In Federal court, before Judge Alsop, the plaintiffs moved for a preliminary injunction, a summary judgment, and the convening of a three-judge court, all on the grounds that the Act (1) was preempted by ERISA; (2) became null and void by its own terms when ERISA was enacted; and (3) violated numerous provisions of the Constitution. In Fleck v. Spannaus, 412 F. Supp. 366 (D. Minn. 1976), Judge Alsop held:

(1)   ERISA, pursuant to 29 USCA, § 1144, did not preempt state law until January 1, 1975;

(2)   The issue of whether to abstain from a construction of the termination provision of the Act should be made by a three-judge court;

(3)   A three-judge court should be convened.

A three-judge court, consisting of Judges Heaney, Devitt, and Alsop, was convened and plaintiffs moved for a summary judgment enjoining the enforcement of the Act on the grounds that (1) the Act became null and void by its own terms upon the passage of ERISA; and (2) the Act violated numerous provisions of the Federal Constitution. The defendants had moved for abstention to permit this court to construe the Act and, in the alternative, argued the Act was constitutional in all respects. The three-judge court certified to this court questions of law as to the effect of the enactment of ERISA on the termination provisions of the Act. In so doing, it noted that a construction of the Act by this court which would hold that the Act became null and void on September 2, 1974, and that all accrued and existing

causes of action ceased to exist at that time would avoid the necessity of reaching the constitutional issues raised.

A. Date on Which Minnesota Legislature Intended Minnesota Private Pension Benefits Protection Act to Terminate.

The first of the three questions certified to this court is the following:

"(1) Upon what date did the Minnesota Private Pension Benefits Protection Act, Minn. Stat. § 181B.01 *et seq.* (1974) (hereinafter the 'Minnesota Pension Act') become null and void pursuant to Minn. Stat. § 181B.17?"

The law which we are asked to interpret is the final section of the Act, Minn. St. 181B.17, which states:

"Sections 181B.01 to 181B.17 shall take effect the day following final passage. Provided that sections 181B.01 to 181B.17 shall become null and void upon the institution of a mandatory plan of termination insurance guaranteeing the payment of a substantial portion of an employee's vested pension benefits pursuant to any law of the United States."

This is the first time this court has construed the Act.[13] A brief mention of problems which gave impetus to the recent remedial legislation in the area of private pension plans might serve as a helpful preface to a discussion of the Act and ERISA. One commentator aptly summarized the problems of the private pension system in these terms:

---

[13] In White Motor Corp. v. Malone, 545 F. 2d 599 (8 Cir.), reversing 412 F. Supp. 372 (D. Minn. 1976), the Court of Appeals for the Eighth Circuit reversed a decision of the Federal District Court for Minnesota which had held that the Act as applied to White Motor Corporation was not preempted by the Federal law under the National Labor Relations Act. The appellate court held that as applied to White Motor the Act attempted to regulate the terms of a collective bargaining agreement and thus was preempted by Federal labor law. Because the Allied Pension Plan is not a union plan, the White Motor decision does not apply to the present case.

"(1). The problems of coverage. Only about one-half of the labor force is employed by employers who have established pension or profit-sharing plans and approximately three-fourths of those who do work for such employers are actually participants in the plans operated by those employers.

"(2). The lack of adequate vesting provisions in existing plans. In many of the existing plans vesting was so long delayed that there was little chance that an employee would actually receive a pension unless he remained with the employer until he reached normal retirement age.

"(3). The lack of adequate funding. Many employers failed to make contributions that were large enough to fund adequately their plans, and in the event of early termination even those employees with vested rights received only a small fraction of the amount that they might reasonably have anticipated.

"(4). Failure of the employer or the pension trustee to furnish the employee with adequate information as to his rights under the plan and as to the financial stability of the trust established under the plan.

"(5). The failure of the federal government to protect fully the rights of employees by adequate regulations. Regulation was entrusted entirely to the Internal Revenue Service which was rightly concerned with the tax aspects of the plan and not with rigid enforcement of the rights of employee participants." Snyder, *Employee Retirement Income Security Act of 1974*, 11 Wake Forest L. Rev. 219, 226.[14]

Consideration of early House and Senate versions of what became ERISA preceded the passage of the Minnesota Act. The first of the five bills which contributed to ERISA was S. 4, reported by the Senate Labor and Public Welfare Committee on April 18, 1973. See, generally, 1974 U. S. Code Cong. & Ad. News

---

[14] See, also, 1974 U. S. Code Cong. & Ad. News pp. 4639, 4640-4646 (background on major issues of private pension law facing drafters of ERISA).

4838. Under this proposal the vesting and funding provisions would have become effective 3 years after enactment and the termination insurance provisions 1 year after enactment. Id. 4883. The House version, labeled H. R. 2, was a compromise bill combining H. R. 2 and H. R. 12855. It was passed on by the House February 28, 1974. Under H. R. 2, as reported by the House Education and Labor Committee, both the vesting and funding requirements would have become effective 2 years after enactment. Id. 4662. Termination insurance would have applied to insure unfunded vested liabilities incurred prior to enactment of the proposal, as well as after its enactment. Id. 4662, 4663. The Senate passed H. R. 2 on March 4, 1974, with amendments that generally substituted language from the earlier Senate bill. The House did not agree to the amendments and a conference committee was appointed.

Thus, when the Minnesota Private Pension Benefits Protection Act was enacted on April 9, 1974, the final provisions of the Federal act (and even its passage) were uncertain. The conference committee had yet to report and final provisions and effective dates were unknown.

When it passed the Act, the Minnesota legislature certainly was aware of the Congressional activity (or lack of it). Viewed in light of the uncertainty of the date of passage of the Federal legislation and the similar uncertainty of the final Federal provisions, it is most reasonable to believe the Minnesota legislature passed the Act in response to the delay in Congressional action. More important, it is also most reasonable to believe the legislature intended the Act to provide immediate, full, and lasting protection for workers—protection which would last until the Federal act displaced it. To provide the fullest protection the legislature must have intended the state legislation to remain in effect as long as possible. If not preempted, this would mean a state act which would dovetail as closely as practical with the Federal act. The problem which it was responding to was not of the type which could be attacked piecemeal, and the need for reform was

pressing. It cannot be assumed that gaps in overall protection were intended.

ERISA was signed into law by President Ford on September 2, 1974. The conference report had been passed by the House August 20, 1974, and the Senate August 22, 1974. 1974 U. S. Code Cong. & Ad. News p. 4639. ERISA sets forth detailed standards in the important areas of private pension funding, vesting and termination insurance, among others.[15]

With respect to funding, ERISA requires that past service costs be amortized to relieve the hardship created when underfunded plans terminate. Plans must eliminate unfunded past liabilities and attain fully funded status within a prescribed number of years. 29 USCA, § 1082. For plans in existence on January 1, 1974 (such as Allied's), the funding requirements apply to plan years beginning after December 31, 1975. 29 USCA, § 1086(b).

With regard to vesting, ERISA specifies minimum vesting and strict participation standards. See, 29 USCA, §§1051 to 1061. Under ERISA an employee generally cannot be compelled to wait more than 1 year before participating in his employer's plan. However, employees could be compelled to wait until they reach the age of 25 to participate. 29 USCA, § 1052(a)(1)(A). Three alternative vesting formulae are provided. First, an employer can use a graded schedule under which an employee must become 25 percent vested after 5 years; the employee also must receive an additional 5 percent interest for each of the next 5 years, and 10 percent for each of the final 5 years. 29 USCA, § 1053(a)(2)(B). Second, the employer can provide a schedule by which an employee is 100 percent vested after 10 years of service. 29

---

[15] In addition to providing new standards for vesting, funding, and termination insurance, ERISA also sets fiduciary standards for the management of plans, 29 USCA, §§ 1101 to 1114; prohibits reduction of pension benefits based on increases in social security benefits, 29 USCA, § 1056(b) (1, 2); provides for the administration of the law by the Treasury and Labor Departments, 29 USCA, §§1201 to 1242, and further study of designated pension-related areas, 29 USCA, §§ 1221 to 1232.

USCA, § 1053(a)(2)(A). Finally, a "rule of 45" formula provides that a worker with at least 5 years of service becomes 50 percent vested when the sum of his age and years of service equals 45; for each of the next 5 years the worker's account must be vested in an additional 10 percent. 29 USCA, § 1053(a)(2)(C). Benefits derived from a worker's own contributions to the pension fund are at all times 100 percent vested and nonforfeitable. 29 USCA, § 1053(a)(1). These provisions became effective for Allied no sooner than January 1, 1976. 29 USCA, § 1061(b)(2).

Finally, with respect to termination insurance, ERISA established the Pension Benefit Guaranty Corporation (PBGC) within the Department of Labor to protect participants from losses caused by plan terminations. See, 29 USCA, §§ 1301 to 1323. Plans are required to subscribe to the PBGC by paying per capita premiums, which may decrease in later years as unfunded liabilities diminish, 29 USCA, § 1306(a). A solvent employer whose plan terminates may be liable to the PBGC for benefit payments which it has made, 29 USCA, §§ 1362(b), 1368. The premium payment provisions for both benefit and contingent liability coverage became effective September 2, 1974, 29 USCA, § 1381(a), while benefit payments for previously vested benefits for single-employer plans which terminated after June 30, 1974 and before September 2, 1974 were covered provided the plan terminated for a reasonable business purpose and the employer filed a timely notice with the Secretary of Labor, 29 USCA, § 1381(b).

As applied to the Allied Plan, ERISA would not have "guarante[ed] the payment of a substantial portion of [an Allied] employee's vested pension benefits" until at least January 1, 1976, the earliest date on which all these titles of ERISA could apply to Allied.

It seems clear to us that the Minnesota Legislature intended to protect persons employed in Minnesota by vesting rights which they would otherwise be denied under existing law. The Act was intended to be effective until Federal laws would sub-

stantially protect the same rights. Thus, because under the Federal law (ERISA), the mandatory vesting and funding requirements did not apply until plan years beginning after December 31, 1975, our legislature intended Minn. St. 181B.01 to 181B.17 to be effective until those dates and we so hold. We pass only on the intent of our own state's legislature at the time of the passage of the Act.

In any event, the Minnesota statute was effective on July 31, 1974, when Allied terminated 11 employees in connection with ceasing to operate a place of employment in Minnesota. On that date, Allied's employees received mandatory vesting of their pension rights under Minnesota law, because they did not have vesting under the Allied pension plan itself. There would be little point in passage of the Act if it did not accomplish what the legislature so obviously intended—protection to pension rights of Minnesota employees. Thus, as to the first certified question we hold the Minnesota Act did not become null and void under the terms of Minn. St. 181B.17 until the funding, vesting, and termination insurance provisions of ERISA applied.

B. Effect on Pending Causes of Action and Administrative Proceedings.

The second and third certified questions may be treated together. They are:

"(2)    What effect does the termination of the Minnesota Pension Act have upon any cause of action which may have accrued prior to the date of such termination but upon which no administrative proceeding had been commenced?

"(3)    What effect does the termination of the Minnesota Pension Act have upon any cause of action which was the subject of a pending administrative proceeding on the date of the termination of the Act?"

Allied vigorously contends the "null and void" language of the Act would render any pending matters totally without effect.

Two considerations, however, require an opposite result. First,

the Act must be construed as a whole and in light of the evil which it sought to remedy. The drafters of the Act were aware of ERISA and the provisions it likely would have in its final form. As already discussed, when the Act was passed both the United States Senate and House had passed their own versions of ERISA and the conference committee had yet to recommend final provisions. The Minnesota Legislature passed the Act with the knowledge that ERISA was pending, but without knowing when (and if) it would finally become effective. With this in mind, it appears clear that what was intended was a continuous period of coverage. If the Act were not to apply to causes of action pending on the date of its termination (or of its preemption by ERISA), the legislature would have performed a useless act. An act would have been passed which would have had no effect.[16] We decline to so hold. See, Minn. St. 645.17(2).

Second, the Act did not end by its own terms. Instead, the Act was preempted. See, 29 USCA, § 1144; Fleck v. Spannaus, 412 F. Supp. 366, 369. For the Act to terminate by its own provision and thus put the words "null and void" in issue, ERISA must provide equivalent benefits. As discussed, however, ERISA would not have provided equivalent benefits until at least January 1, 1976. Thus, the termination provision of the Act did not come into operation. Rather, the Act was preempted before that could happen.

Thus, our answer to both the second and third certified questions is "none."

---

[16] Moreover, Allied's reliance on the "null and void" to draw greater meaning than "void" or "null" alone is misplaced. "Null and void" together mean the same as either of the words separately. In the tradition of "rest, residue, and reminder," "hue and cry," and "part and parcel," among others, the marriage of the word "null" to "void" is a matter of historical accident, harking back to the early need in the law for emphasis in the form of repetition, rather than division of meaning. The words are synonymous. See, Mellinkoff, The Language of the Law, pp. 358-360 (1963).