**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 06-1023**

---

MEDIA GENERAL OPERATIONS, INCORPORATED, d/b/a
Richmond Times-Dispatch,

                Petitioner,

    versus

NATIONAL LABOR RELATIONS BOARD,

                Respondent,

RICHMOND NEWSPAPERS PROFESSIONAL ASSOCIATION,

                Intervenor.

---

**No. 06-1061**

---

RICHMOND NEWSPAPERS PROFESSIONAL ASSOCIATION,

                Petitioner,

    versus

NATIONAL LABOR RELATIONS BOARD,

                Respondent,

MEDIA GENERAL OPERATIONS, INCORPORATED, d/b/a
Richmond Times-Dispatch,

                Intervenor.

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

MEDIA GENERAL OPERATIONS, INCORPORATED, d/b/a
Richmond Times-Dispatch,

Respondent.

On Petitions for Review and Cross-application for Enforcement of an Order of the National Labor Relations Board. (5-CA-29157; 5-CA-29902; 5-CA-29914)

Argued: November 30, 2006          Decided: March 15, 2007

Before NIEMEYER, MICHAEL, and TRAXLER, Circuit Judges.

Petitions for review denied; cross-application for enforcement granted by unpublished per curiam opinion. Judge Niemeyer wrote a separate opinion concurring in part and dissenting in part.

**ARGUED:** James V. Meath, WILLIAMS MULLEN, Richmond, Virginia, for Media General Operations, Incorporated, d/b/a Richmond Times-Dispatch. Jay Joseph Levit, Glen Allen, Virginia, for Richmond Newspapers Professional Association. Kellie J. Isbell, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board. **ON BRIEF:** King F. Tower, Heath H. Galloway, WILLIAMS MULLEN, Richmond, Virginia, for Media General Operations, Incorporated, d/b/a Richmond Times-Dispatch. Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Fred B. Jacob, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the Board.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This consolidated case is before us on the petitions of Media General Operations, Inc., d/b/a Richmond Times-Dispatch (Media General), and Richmond Newspapers Professional Association (RNPA) to review an order of the National Labor Relations Board (NLRB or Board). The NLRB has filed a cross-application for enforcement of its order. The NLRB determined that Media General violated sections 8(a)(1) and (5) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), (5), by disparately enforcing a company e-mail policy and by failing to negotiate before discontinuing payment for time spent by union negotiators in bargaining sessions. The NLRB also dismissed RNPA's complaints that Media General violated sections 8(a)(1) and (5) by failing to negotiate over the discontinuance of holiday bonuses and by failing to pay the union president for time spent in arbitration. For the reasons set forth below, we deny the petitions for review and enforce the Board's order.

## I.

Media General publishes the Richmond Times-Dispatch, a daily newspaper. RNPA represents the newspaper's reporters and other newsroom employees. Successive collective bargaining agreements and accumulated past practice have governed the relationship between Media General and RNPA for the past forty

4

years.  In 2000 and 2001 RNPA complained to the NLRB that Media General had changed certain past practices without bargaining and had enforced its e-mail policy in a discriminatory manner against union members.

## A.

The first complaint stems from Media General's instruction to the union to stop using the company e-mail system to disseminate union messages.  Media General had an official e-mail policy that restricted use of the company e-mail system to matters related to company business.  The policy stated that "[t]he e-mail system is provided to employees at Company expense to assist them in carrying out the Company's business."  J.A. 586.  In practice, however, employees transmitted a wide variety of messages unrelated to company business, including personal messages, charitable announcements, and union matters.  Media General did little to prevent these uses and disciplined only two employees for violations that involved pornography.  The general tolerance for e-mail violations began to change in May or June 1999 when Media General informed the RNPA president, Jonathan Pope, in a telephone conversation that the union could not use the company's e-mail system for communicating union messages.  This was followed by a second verbal warning to Pope in September 1999.  Pope did not convey these warnings to the other union leaders or the general membership.  Apart from a reminder sent to Pope by e-mail in June

5

2000, the company took no further action. The rest of the RNPA bargaining committee first learned of Media General's intent to enforce the e-mail policy during negotiations for a new collective bargaining agreement in July 2000. Media General told union leaders to stop using Media General e-mail for union business. Shortly thereafter, the union complained to the NLRB that Media General had enforced the e-mail policy in a discriminatory manner against the union.

B.

During the same July 2000 negotiations, Media General announced that it would no longer pay employee representatives of the union for time spent in bargaining sessions. Media General had routinely offered such pay since 1995. Despite its past conduct, the company did not allow discussion of its changed stance during the ongoing negotiation sessions. The company stopped paying for bargaining time in September 2000. To avoid a reduction in pay, several union leaders worked additional hours to make up time spent in bargaining sessions.

C.

RNPA also complained that Media General had engaged in an unfair labor practice when it refused to pay a union representative for time spent in arbitration proceedings. The complaint arose out of a 1999 arbitration of an RNPA grievance concerning an employee's discharge. This was the first arbitration between the parties

since 1969. Media General paid RNPA president Pope for time spent discussing the grievance with Media General management, but did not pay him for time spent in formal arbitration proceedings. Media General informed Pope that arbitrations differed from negotiations, and so the general practice of paying for negotiation time did not encompass arbitration time. Pope was required to use a vacation day in order to receive pay for the hours spent in arbitration.

D.

The union's last complaint concerned the elimination of holiday bonuses. Media General had paid employees an annual holiday bonus since 1960. In July 2001 Media General called the RNPA president to discuss the company's plan to discontinue the holiday bonus. The company attributed its decision to a general economic downturn and acknowledged that it was a bargainable issue. Following the phone call to the union, Media General sent a letter to all employees informing them that "[a]s a result of the poor economic climate, we are unable to pay a Christmas or Holiday bonus this year . . . ." J.A. 630. After receiving this letter and the company's offer to bargain, the union requested "books and records from which [it] c[ould] determine whether there [was] a 'cash flow' problem . . . ." J.A. 631-32. The union president declined to bargain until requested financial information was made available to RNPA. Media General explained to RNPA that it had not terminated the bonuses because of an inability to pay; rather, it had

7

voluntarily opted for "belt-tightening."  J.A. 633.  The company maintained that it was not obliged to turn over the requested information and now argues that the union waived its right to pre-termination bargaining by refusing to negotiate.

## II.

Media General urges us to set aside the NLRB order requiring the company to cease its disparate enforcement of its e-mail policy and to negotiate with RNPA over the termination in pay for collective bargaining time.  We will uphold the NLRB's findings of fact when supported by substantial evidence.  TNT Logistics of North Am., Inc. v. NLRB, 413 F.3d 402, 405 (4th Cir. 2005).  We also will defer to the Board's reasonable legal conclusions. Americare Pine Lodge Nursing & Rehabilitation Center v. NLRB, 164 F.3d 867, 874 (4th Cir. 1999).

### A.

An employer engages in an unfair labor practice when it attempts to influence its employees' efforts to organize by interference, restraint, or coercion.  29 U.S.C. § 158(a)(1).  As part of this prohibition, an employer may not interfere with its employees' ability to communicate union messages or discriminate between union communications and other non-company messages in the workplace.  See NLRB v. Challenge-Cook Bros. of Ohio, Inc., 374 F.2d 147, 153 (6th Cir. 1967).  When company-sponsored channels of

8

communication are opened to non-company purposes, the NLRA prohibits an employer from preventing use for union purposes. See NLRB v. Honeywell, Inc., 722 F.2d 405, 406-07 (8th Cir. 1983); E.I. Du Pont de Nemours & Co., 311 N.L.R.B. 893, 893 n. 4, 919 (1993).

Media General first argues that the union's claim was not timely because, if any discriminatory enforcement occurred, it happened at the time of the first warning in 1999. The NLRB reasonably found that the company's July 2000 enforcement of the policy was independent of prior warnings that occurred outside the limitations period. NLRA section 10(b) requires employees wishing to challenge an unfair labor practice to file a charge within six months of the alleged violation. 29 U.S.C. § 160(b). The first warning was issued over a year before the union filed its complaint. The NLRB, however, found that the claim was not time-barred because each of Media General's warnings to the union constituted independent violations of section 8(a)(1). Cf. Brewery, Soda & Mineral Water Bottlers of Calif., 339 N.L.R.B. 769, 770 (2003) (reposting of identical letters within the 10(b) period renders them vulnerable to attack). Under this interpretation, the July 2000 warning falls solidly within the 10(b) period. This warning can reasonably be deemed a separate violation because Media General had taken no action to punish violators after the prior warnings to the union president. Moreover, the July 2000 warning was issued to a broader group of union leaders in the formal

9

context of a collective bargaining session. This distinguishes the July 2000 warning from the company's prior informal communications to Pope.

The NLRB's conclusion on the merits was also reasonable. The Media General e-mail policy restricted use of the e-mail system to company purposes. The company made no attempt, however, to enforce the policy against any violations other than union messages. The record contains numerous examples of messages unrelated to the work of the newspaper. The e-mail system was frequently used by both hourly employees and managers to convey news about the employees' personal lives, to arrange social events, and to inform employees about charities. Restriction of the union's access to this communication channel, while others were allowed unfettered access, is an unfair labor practice that is prohibited by the NLRA.

B.

NLRA sections 8(a)(5) and (d), 28 U.S.C. § 158(a)(5), (d), require employers to engage in good faith collective bargaining with union representatives before changing a term or condition of employment. NLRB v. Katz, 369 U.S. 736, 743 (1962). Terms or conditions of employment are subject to mandatory bargaining if they have been memorialized in a collective bargaining agreement or if they have been established by the employer's past practice or custom. Bonnell/Tredegar Indus., Inc.

10

v. NLRB, 46 F.3d 339, 344 (4th Cir. 1995). Pay for time spent in negotiation sessions may qualify as a subject of mandatory bargaining. See Axelson, Inc. v. NLRB, 599 F.2d 91, 94-95 (5th Cir. 1979).

The collective bargaining agreement between RNPA and Media General does not require the company to pay union representatives for time spent in negotiations. Thus, Media General's unilateral decision to discontinue pay for bargaining time would be prohibited only if the company had established a past practice of awarding such pay. See Bonnell/Tredegar, 46 F.3d at 344. For at least five years, Media General routinely paid union negotiators for time spent in collective bargaining. This is sufficient to establish a past practice. See, e.g., Keystone Steel & Wire v. NLRB, 41 F.3d 746, 750 (D.C. Cir. 1994) (six-year practice established an implied term or condition of employment). The lack of any evidence of an offer to bargain prior to the termination announcement supports the NLRB's conclusion that Media General failed to fulfill its duty to bargain in good faith with RNPA.

III.

In its petition RNPA argues that the NLRB erroneously dismissed its claims related to holiday bonuses and pay for arbitration time. We will uphold the NLRB's dismissal of a claim

11

so long as there is a rational basis in the record for the Board's action.  Am. Postal Workers Union v. NLRB, 370 F.3d 25, 27 (D.C. Cir. 2004).

A.

RNPA claims that Media General impermissibly altered a term of employment by refusing to pay union representatives for time spent in arbitration of grievances.  The union argues that the company's past practice of paying for time spent in preliminary grievance proceedings and collective bargaining prevent Media General from refusing to pay for arbitration time without first bargaining to impasse.

Grievances between RNPA and Media General are typically resolved before reaching arbitration.  The only other arbitration in recent memory was held in 1969.  The collective bargaining agreement between the parties distinguishes between ordinary grievance resolution and arbitration.  When a grievance is brought, the parties have five days in which to hold a meeting and attempt to reach agreement regarding the dispute.  The dispute goes to arbitration only if the parties fail to reach agreement within thirty days and one of the parties requests it.  Unlike the preliminary grievance proceedings, an arbitration involves outside decisionmakers and takes on a more adversarial tone.  The NLRB could reasonably conclude that Media General may have wanted to pay for cooperative efforts to resolve grievances to avoid arbitration,

12

but not wanted to pay once negotiations had broken down and outside dispute resolution was required.  Thus, the NLRB had a rational basis for concluding that the infrequency of arbitrations and the differing roles assumed by the parties support an inference that the company wished to establish a custom of pay for preliminary grievance resolution but not for arbitration.  The NLRB reasonably required the union to show a past practice relating specifically to arbitration proceedings.  Because only one other arbitration had occurred in the preceding thirty years, the union failed to show that pay for arbitration time had become an implied term of employment and a mandatory subject of bargaining.

B.

Media General concedes that the annual holiday bonus was a term of employment that it could not change unilaterally without bargaining.  It argues, however, that it was relieved of the duty when RNPA rebuffed its offer to bargain for no valid reason.  RNPA claims that it was entitled to examine certain company financial data before bargaining and that Media General violated the NLRA by withholding the requested information.

An employer's refusal to accommodate a union's request for financial information to substantiate a claimed inability to meet union demands "may support a finding of a failure to bargain in good faith."  NLRB v. Truitt Mfg. Co., 351 U.S. 149, 153 (1956).  The company need not honor such requests when it expresses only an

13

unwillingness to pay.  Wash. Materials, Inc. v. NLRB, 803 F.2d 1333, 1338-39 (4th Cir. 1986).

To show Media General's inability to pay, the union relies on a letter sent by Media General to all employees informing them of its decision to discontinue payment of holiday bonuses. The letter stated that the company was "unable to pay" the 2001 holiday bonus because of the "poor economic climate."  J.A. 630. The letter described the elimination of bonuses as part of a broader plan to cut costs and avoid layoffs.  Despite the "unable to pay" language, reasons such as these are generally interpreted as expressions of unwillingness to pay. Nielsen Lithographing Co., 305 N.L.R.B. 697, 700 (1991).  Elimination of a benefit in response to poor economic conditions is not the same as a claim that the company is without resources to pay the benefit.  The company's response to the union's request for financial information clarified explicitly that it was unwilling, rather than unable, to pay the bonuses.  Substantial evidence thus supported the NLRB's conclusion that Media General had no duty to disclose its financial information to the union.

Without any unfulfilled duty on the part of Media General, RNPA had no basis for its refusal to bargain.  A union must act with due diligence to request bargaining when it receives notice of a contemplated change in the terms or conditions of employment.  Haddon Craftsmen, Inc., 300 N.L.R.B. 789, 790-91

14

(1990).  If the union fails to make such a request, there are no grounds for finding that the employer violated its duty to bargain in good faith.  Id.

After declining Media General's initial offer to bargain, RNPA never asked for independent bargaining sessions to address the bonus issue.  The record contains testimony indicating that the bonuses may have been discussed during the general negotiations over the new collective bargaining agreement.  However, the contradictions in the record and the union's clear failure to request bargaining on the bonus issue provide a rational basis for the NLRB's conclusion that Media General did not violate its duty to bargain.

IV.

In sum, substantial evidence supports the NLRB's conclusions that Media General violated NLRA sections 8(a)(1) and (5) by enforcing its e-mail policy in a discriminatory manner and discontinuing pay for time spent in negotiations.  The NLRB also had a rational basis for dismissing RNPA's arbitration and holiday bonus claims.  We therefore deny the petitions for review and grant the Board's application for enforcement of its order.

PETITIONS FOR REVIEW DENIED;
CROSS-APPLICATION FOR ENFORCEMENT GRANTED

15

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

I would grant the petition for review and deny the NLRB's enforcement with respect to the e-mail policy. Otherwise, I agree with the majority opinion.